Robinson *v.* Storm.

ROBINSON *v.* STORM.

(*Jackson.*    June   10,   1899.)

1. PARTNERSHIP.   *Sale of assets and good will.*

A sale of the assets and good will of a drug firm passes to the
    purchaser the exclusive right to a formula for the preparation
    of a valuable medicine owned by the firm, and the trade-marks
    used by the firm in placing the medicine on the market
    (*Post, pp. 41–43.*)

2. TRADE-MARK.   *Right to.*

A druggist is entitled to the exclusive use of the term "Storm's
    Liver Regulator," when, for a quarter of a century he had, at
    great cost and labor, prepared and placed on the market a
    medicine which was labeled and sold under that designation,
    and had, as such, become generally, favorably, and distinct-
    ively known throughout a wide territorial area.   (*Post, pp.
    41–47.*)

3. SAME.   *Unlawful simulation.*

The proprietor of an established trade-mark is entitled to injunc-
    tion against the use by another, though innocently done, of
    an advertising device, which, though differing in minor
    details, so far resembles his trade-mark, in general features
    and effect, as to deceive ordinary, incautious observers,
    although the differences might be obvious to an expert.
    (*Post, pp. 47, 48.*)

4. SAME.   *Use of name as.*

A person has an undoubted right to use his own name in his
    business, but he may not use it in such manner as to defraud
    another.   (*Post, pp. 48–56.*)

FROM SHELBY.

Appeal from Chancery Court of Shelby County.
LEE THORNTON, Ch.

Robinson *v.* Storm.

METCALF & METCALF and CARROLL & McKEL-
LAR for Robinson.

PERCY & WATKINS for Storm.

BEARD, J.   The bill in this case alleges that
complainant is the owner of a formula, and for
over twenty years has been engaged in preparing
from it a valuable medicine well known as
"Storm's Liver Regulator," for which, after the
expenditure of large sums of money, he has cre-
ated a wide and constantly increasing market, par-
ticularly in the Southern Mississippi Valley, and
that defendant had recently caused to be prepared,
by some one unknown to complainant, a spurious
compound, and was seeking to secure purchasers
for it by pirating complainant's trade-mark or
trade name, and by resorting to other devices
equally illegal, and thus appropriate wrongfully the
patronage which the complainant had acquired for
his medicine.   The object of the bill was to se-
cure a perpetual injunction against the acts of
the defendant.

The facts established by the testimony may be
summarized as follows: In the year 1872 Dr.
Mitchell, an eminent physician in Memphis, find-
ing the need of preparing a vegetable cathartic
which could be substituted for calomel, finally se-
lected the ingredients for such a medicine and took
a formula embracing them to the drug firm of
Stever & Robinson and asked them to experiment

with it, so that, with the addition of aromatics such as they might find suitable, they could make a liquid compound agreeable to the palate of the patient. The formula was placed in the hands of the complainant Robinson, who was of that firm (an educated pharmacist), who, after many efforts, succeeded in making a combination satisfactory to Dr. Mitchell and his firm.

From this time it is evident Dr. Mitchell exercised no control over, nor claimed any interest in, this formula. For many years he retained a recollection of the constituents of this medicine, but the proportion of the ingredients he did not know, so that he prescribed it always to his patients as "Comp. Elix. Leptandra," who, taking the prescription to Stever & Robinson, and afterwards to complainant, as the successor of that firm, would get it filled. One of the earliest of these preparations was given by Dr. Mitchell to Captain Ad. Storm, a citizen of Memphis, of wide and influential acquaintance, who made frequent use of it, and, finding himself greatly benefited, recommended it to a great many of his friends, the result of which was that it soon became a popular remedy in Memphis and along the Mississippi River.

So instrumental was Captain Storm in its introduction to the public, that Stever & Robinson, who were thus getting the benefit of his recommendations of it, and whose relations to him were of

Robinson *v.* Storm.

a friendly character, with his consent, after a little time put it up and sold it as "Storm's Liver Regulator." This was done out of compliment to him.

In 1873 Robinson purchased Stever's interest in the assets and good will of Stever & Robinson. By this purchase he acquired the sole right to this formula, and, by operation of law, the firm's trade-marks used in placing the medicine made from this formula on the market. *Murry* v. *Hopes,* 111 N. Y., 415; *Huxis* v. *Clary,* 143 Mass., 592; *Myers* v. *Kalamazoo,* 54 Mich., 215; *Shipright Chemists,* Cox's Trade-mark Cases, 99.

From the time of this purchase he has been extensively preparing and placing on the market this remedy, and has succeeded in creating a wide, popular demand for it. In doing so he has expended much labor and large sums of money. All the time it has been conspicuously labeled and sold as "Storm's Liver. Regulator," so that in the wide territorial area in which it is used these words have become distinctive, and are associated alone with the compound of complainant.

Several years ago Captain Storm died. After his death the defendant, an only child, but neither a druggist or chemist, began his efforts to acquire this formula, with the view of preparing and selling this medicine on personal account. To this end he approached Dr. Mitchell, who declined to give him any aid in accomplishing his purpose.

Failing there, he secured from Dr. Goodyear, a druggist of Memphis, a formula, from which, for several years that gentleman had been puttting up a medicine, which he called "Goodyear's Liver Tonic." This he took to St. Louis, where he had certain manufacturers to prepare from it a liquid mixture, which he caused to be carried in demijohns from the premises of these manufacturers to another place in the city, when he transferred it to bottles, on which he placed the cartons and labels complained of in the bill. After so preparing it the defendant shipped it to Memphis; not to himself, but to one Battier, as consignee, from whose place of business he was distributing it among the retail druggists of the last-named city when enjoined by complainant.

As a part of the record in this cause there has been sent up the packages of these respective parties. Upon examination we find that the labels attached to the bottles of both complainant and defendant, in large display type, have the catch words, "Storm's Liver Regulator," while the bottles are of the same general shape, the necks, however, of those of defendant being a little longer than the necks of those of complainant. Below the catch words given above, in language little differing in form and phrasing, each medicine is highly recommended for diseases attendant upon a torpid liver. The respective cartons vary in color, but this is not sufficiently pronounced to place the

Robinson *v.* Storm.

average purchaser on guard. On these cartons, as on the labels, there is printed in heavy and conspicuous lines the words, "Storm's Liver Regulator," and in both the word "Storm's" is placed conspicuously above the words "Liver Regulator." On the front of the cartons of the complainant, just below the word "Storm's," is a mortar and pestle, surrounded by a black rim, on which is inscribed, "Only the best," while over the catch words, "Storm's Liver Regulator," for the carton of the defendant is a picture of Captain Storm. At the foot of the front of the carton of complainant is printed the words, "Prepared by Jas. S. Robinson, Apothecary, Memphis, Tenn.," while at the same place on defendant's carton are the words, "Prepared by eminent chemists for A. G. Storm," followed by the words, "This is not the medicine put up by James S. Robinson," this name of Robinson appearing below the line of negation, in the place where the name of the owner of a proprietary medicine, according to the testimony, is ordinarily found, and in a form much more likely to attract the eye of a purchaser than the word "not" in the line of negation.

On the side of complainant's carton is a statement as follows: "This prescription has grown from a single prescription written by one of our leading physicians, whose experience in the treatment of diseases which it is given for has been very extensive and who prescribed it among the first for

Captain Storm; hence the name. It has outgrown the sales of any patent tonic on the market, because it has merit, and it is not a catch-penny preparation, like most of the so-called liver preparations." At the same place on the defendant's carton is printed the following statement: "This medicine is based on the original prescription prepared for Captain Ad. Storm, at his own solicitation, by his physician, one of the leaders of the profession in the city of Memphis, Tenn. This is not the medicine put up by Jas. S. Robinson, chemist, Memphis, Tenn. When buying, see that you get the white enameled carton, having the likeness of Captain Ad. Storm and the signature of his son. Manufactured and distributed from St. Louis, Mo. (Signed) G. A. Storm."

That the statement on the defendant's carton that his medicine was based on the original preparation prepared for Captain Ad. Storm by his physician, in the light of this record, is evidently misleading, while on the other hand it is equally clear that the corresponding statement on the carton of the complainant is true. An examination of these labels and cartons satisfies us that whatever may have been the purpose of the defendant, yet that very easily, even with an ordinarily cautious purchaser, the medicine of the defendant could be substituted for that of the complainant, and that as defendant was offering his at a less figure

than the complainant sold his, this would be done by unscrupulous dealers.

In the case many witnesses were examined, among them being men of high standing and much intelligence, who have been accustomed to the preparation of the complainant for many years and who have valued it as based upon a prescription of Dr. Mitchell, and they concur in saying that they would, in buying from any reputable druggist, take without question the preparation of the defendant as that of the complainant. Two of these gentlemen say that, upon calling for the medicine (intending complainant's), the retailer gave them the defendant's preparation, and that afterwards noticing the picture of Captain Storm on the carton, they supposed that this was done by the complainant out of compliment to his memory, and it was only after reading the entire inscription that they discovered they did not get what they intended to buy. With regard to that class of persons who are the largest buyers of proprietary medicines, the testimony is without contradiction that it would be an easy matter to palm off the medicine of defendant for that of complainant.

Under such circumstances we have no doubt of the right and the duty of a Court of Equity to interfere. It is immaterial that there is a lack of an imitation of the labels and cartons so as to deceive an expert, or even an ordinary observer,

when those of the defendant and complainant are placed side by side. It is sufficient that it is a simulation likely to deceive an incautious and ordinary purchaser. Browne on Trade-marks, Secs. 33, 385; *Shaw Stocking Co.* v. *Mack,* 12 Fed. Rep., 707; *Centaur Co.* v. *Robinson,* 91 Fed. Rep., 889; *Centaur Co.* v. *Neatherly,* 91 Fed. Rep., 891. As has just been stated, the evidence, with much unanimity, shows that notwithstanding the differences, yet the simulation is sufficient to deceive both cautious and incautious buyers.

But it is argued that defendant is entitled to use his own name in placing his own medicine on the market, and that if complainant is injured thereby he must bear the consequences of having selected as a part of his trade-mark or trade name a name common to others.

The law is settled that no one can acquire the right of a trade-mark, either in his own name or in that of another person, so as to exclude one of the same name in using it to identify goods which he sees proper to put on the market, so long as in doing so the latter perpetrates no fraud thereby or is guilty of no unfair artifice. In the words of the Supreme Court of New York, in the well-considered case of *Higgins Co.* v. *Higgins Soap Co.,* 144 N. Y., 462: "The right of a man to use his own name in his own business the law protects, even when such use is injurious to another who has established a firm

business of the same kind and gained a reputation which goes with the name. But in such cases the Courts require that the names shall be honestly used, and they permit no artifice or deceit designed or calculated to mislead the public and palm off the business as that of the person who first established it and gained it its reputation. *Croft* v. *Day,* 7 Beav., 84; *Halloway* v. *Halloway,* 13 *Id.,* 209; *Cement Co.* v. *Le Page,* 147 Mass., 206. It is well settled that an exclusive right may be acquired in the name of a partnership or of an individual, and it will be protected against infringement by another who assumes it for the purpose of deception, or even when innocently used without right to the detriment of another, and this right, which is in the nature of a right to a trade-mark, may be sold or assigned. *Levy* v. *Walker,* 10 Ch. Div., 436; *Huxis* v. *Clary,* 143 Mass., 592; *Bassett* v. *Percival,* 5 Allen, 345; *Cement Co.* v. *Le Page,* supra; *Willington* v. *Fox,* 3 Mylne & Cr., 338."

In the case of *Singer Mfg. Co.* v. *June Mfg. Co.,* 163 U. S., 169, the foregoing principle is thus stated: "Every one has the absolute right to use his own name honestly in his own business, even though he may thereby incidentally interfere with and injure the business of another having the same name. In such case the inconvenience or loss to which those having a common right are subjected is *damnum absque injuria.* But al-

though he may use his name, he cannot resort to any artifice or do any act calculated to mislead the public · as to the identity of the business, firm, or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name. Where the name is one which has previously thereto come to indicate the source of manufacture of particular devices, the use of such name by another, unaccompanied with any precaution or indication in itself amounts to an artifice calculated to produce the deception."

This principle was applied by the Circuit Court of appeals · of the Seventh Circuit for the protection of the proprietor of "Stuart's ·Dyspepsia Tablets" against a defendant who used his own name and put on the market a medicine which he called "Dr. Stewart's Dyspepsia Tablets." The Master in that case found, among other things, that the similarity in sound between "Stuart's Dyspepsia Tablets" and "Dr. Stewart's Dyspepsia Tablets" is such as would be likely to deceive careless persons, and even ordinarily careful persons, but that the appearance of the respective packages is such that no reasonably careful person could mistake one for the other. They differ materially in size and shape, and most radically in color, and in the style, color, and general appearance of the printed matter. Besides the particulars · enumerated, another important difference, · and one which is calculated

to attract immediate attention, is in the fact that the defendant's packages are covered with a sealed wrapper, while the complainant's boxes have no wrapper at all, and are not sealed in any way. Other respects in which the defendant's packages differ from the complainant's are in the presence of the abbreviation "Dr.," the absence of the facsimile of signature, and a different spelling of the name "Stewart."

But the Court said: "Almost in his (F. G. Stewart's) first attempt to market his wares he was advised by dealers that he was encroaching upon the rights of the appellant. It is manifest that he was. It needs no argument to show that these names are *idem sonans,* and that the use of both in connection with dyspepsia tablets must cause great confusion in the sale and great wrong to purchasers. It is clear to us that the appellee, F. G. Stewart, and his corporation so understood and so designed. They knew of the extensive advertisement which the appellant indulged with respect to his goods. They knew that an immense trade had, in consequence, been built up and a large demand existed for "Stuart's Dyspepsia Tablets." They sought to appropriate to themselves that good will and to impose upon the public their manufacture as the goods of the appellant. Stewart justified himself to the wholesale dealers who cautioned him by the claim that he used his own name, and that he had a right to use it as he would.

Therein he was in error. A man may not use
his own name to accomplish a fraud, designed or
constructive." *Stuart* v. *Stewart*, 91 Fed. Rep., 245.

The case of *Myer* v. *Dr. Bull Vegetable Co.*,
58 Fed. Rep., 884, was one where the complain-
ant had placed on the market a cough syrup by
the name of "Bull's Cough Syrup" and "Dr. Bull's
Cough Syrup," and had established a large trade.
The defendant, whose name was Bull, began to
put a cough remedy on the market and designated
it as "Dr. B. L. Bull's Celebrated Cough Sryup."
Upon the bill filed the defendant was enjoined
from disposing of any remedy to which shall be
applied in any form or manner, as the name there-
of, the words "Dr. B. L. Bull's Cough Syrup,"
or the words "Bull's" and "cough syrup," etc., the
Court (Harlan, Circuit Justice, and Woods, Cir-
cuit Judge) saying: "While the right of no one
can be denied to employ his name in connection
with his business, or in connection with articles
of his own production, so as to show the busi-
ness or product to be his, yet he should not be
allowed to designate his article by his own name
in such way as to cause it to be mistaken for
the manufacture or goods of another already on
the market under the same or similar name. Whether
it be his name or some other possession, every
one, by the familiar maxim, must so use his own
as not to injure the possession or right of another."

In *Russia Cement Co.* v. *Le Page,* 147 Mass., 206, the facts were that the complainant was engaged in the manufacture and sale of glue, under the trade-mark of "Le Page's Liquid Glue." The defendant, Le Page, and one Brooks, had formerly been engaged in that business and used that trade-mark, and then sold out to the complainant. Defendant thereafter manufactured glue, and called it "Le Page's Improved Liquid Glue," and adopted for his name and address "Le Page's Liquid Glue and Cement Company," Gloucester, Mass. Upon a bill filed he was enjoined from the use of the trade mark, the Court holding that he should be enjoined from the use of the words "Le Page's Liquid Glue" or "Le Page's Improved Liquid Glue" to describe the articles manufactured by him, and enjoined him from using the name "Le Page's Liquid Glue Company," whether with or without an addition thereto; and further held that, while the defendant cannot use the words adopted by the plaintiff as a trade name for the articles manufactured by him, it does not follow that he may not use the words "liquid glue," or other appropriate words, to describe his property, or to state in that connection that he is the manufacturer of it.

In the English case of *Seixo* v. *Provenzende,* 1 Ch. App., L. R., 192, Lord Cranworth said: "I do not consider the actual physical resemblance of the two marks to be the question for consideration.

If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular name, I think that the adoption by a rival trader of any mark which will cause his goods to bear the same name in the market, may be as much a violation of the rights of that rival as the actual copy of his device." And in the case of *Coffeen* v. *Brunton,* 4 McLean, 516, Judge McLean said: "In the case under consideration, in his label the complainant calls his medicine the 'Chinese Liniment,' the defendant calls his the 'Ohio Liniment;' but from the use of the medicines it is clear that the language of the defendant is so assimilated to that the body of the labels and of the directions for of complainant's as to appear to be the same medicine, the alteration being only colorable. There would seem to be no doubt that the intention of Loree, who prepared the liniment sold by defendant, as his agent, was to avail himself of the favorable reputation acquired by the 'Chinese Liniment' in the sale of his, and by most persons it would be received as the same medicine;" therefore an injunction was granted.

Cases of like import might be indefinitely multiplied , but we content ourselves with referring, as further authority, to *Gato* v. *El Modello Cigar Mfg. Co.,* 25 Fla., 886 (S. C., 6 L. R. A., 823); *Spaver* v. *Shover,* 54 Iowa, 208; *Baker* v. *Baker,* 87 Fed. Rep., 209; *Duryea* v. *National*

*Starch Co.*, 79 Fed. Rep., 651; *Stonebraker* v. *Stonebraker*, 33 Md., 252; *Thorley's Cattle Food Co.* v. *Massam*, 42 L. T. Rep., N. S., 851 (S. C., No. 668 Cox's Manual Trade Mark Cases).

We have examined the cases relied upon by defendant's counsel, and, when considered with their limitations, we do not think they support the contention of the defendant, or are necessarily out of line with those which we have referred to as authority for the contrary view, unless it possibly be that of *Fish* v. *Fish*, 16 Wis., 453.

But were it otherwise, upon the overwhelming weight of both English and American authority, the defendant, on the facts of this record, was guilty of an infringement of the trade-mark of complainant, and of an illegal, improper, and unfair competition in business with complainant, as well as of attempted imposition upon the public, and the Chancellor was correct in so holding. We find that his decree perpetually enjoined the defendant from using in connection with the manufacture, sale, and advertisement of his medicine, upon his packages, wrappers, cartons, and bottles, or otherwise, the words "Storm," "Captain Storm," or "Ad. Storm," in connection or collocation with the words "liver regulator;" (2) from the use of the words, "This medicine is based on the original prescription prepared for Captain Ad. Storm at his own solicitation, by his physician, one of the leaders of the profession in the city of Memphis, Tenn.,"

and from using those words or any other language or words of like significance, import, or effect, or susceptible of the meaning conveyed by said quoted words; (3) from the use of the words, "Captain Storm's extensive acquaintance led many to try the prescription with the same remarkable results as attended him when it was for the first time prescribed," and from using any other language or words of like import, significance, or effect, implying that defendant's medicine had been prepared, prescribed for, or used by Captain Storm; (4) from using the name of complainant upon any of his packages, cartons, wrappers, or bottles; (5) from manufacturing, selling, or attempting to sell, any liver remedy purporting to be made from or based on a formula or prescription used by complainant or Stever & Co. in the preparation of a liver medicine, or liver regulator, first known as "Elixir Leptranda Comp.," and thereafter known as "Storm's Liver Regulator," or advertising upon his labels, packages, wrappers, cartons, or bottles that the medicine sold by the defendant is based upon or prepared from any such formula, or in use of any language thereon, so meaning, indicating, or implying, or words susceptible of such meaning, is within the scope of the pleadings, and the Chancellor's decree is therefore in all respects affirmed.