## NEUHOFF, Inc., v. NEUHOFF PACKING CO.
### No. 10545.

Circuit Court of Appeals, Sixth Circuit.

April 12, 1948.

Holman Willis and Holman Willis, Jr., both of Roanoke, Va. (Willis & Willis, of Roanoke, Va., and Armistead, Waller, Davis & Lansden, of Nashville, Tenn., on the brief), for appellant.

Charles H. Smith, of Knoxville, Tenn. (Charles H. Smith, of Knoxville, Tenn.,

Seth M. Walker, of Nashville, Tenn., on the brief; Smith & Smith, of Knoxville, Tenn., and Walker & Hooker and David M. Keeble, all of Nashville, Tenn., of counsel), for appellee.

Before HICKS, ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

Neuhoff, Incorporated, a Virginia corporation, has appealed from a decree of the United States District Court for Middle Tennessee which enjoined it from engaging in specified acts of unfair competition with Neuhoff Packing Company, a Tennessee corporation. The use of its corporate name by appellant and its use of the trade names "Neuhoff" and "Neuhoff's" in proscribed territory was found, in the circumstances of the case, to constitute "constructive fraud."

As is generally true in litigation pertaining to unfair competition, the facts must be set forth somewhat in detail.

In 1889, Henry Neuhoff, later joined in partnership by his brother, Lorenz Neuhoff, engaged in business in Nashville, Tennessee. At first, hams were bought from a slaughterhouse, processed, and sold in and around Nashville. By 1902, the business had expanded to include slaughtering, as well as processing. More working capital was required to obtain the full benefit of increasing prosperity; so, in 1906, the two partners, together with another brother and other persons, obtained a Tennessee charter under the name "Neuhoff Abattoir and Packing Company, Inc.," changed by charter amendment in 1919 to "Neuhoff Packing Company." In August, 1930, the charter of Neuhoff Packing Company was surrendered to the State of Tennessee; and, on the same date, the company was reincorporated by the same name.

Immediately after the original charter had been obtained in 1906, Henry Neuhoff and Lorenz Neuhoff, in consideration of issuance to them of stock in the corporation, conveyed to it the assets and good will of the partnership and the trade name "Neuhoff." In 1911, the corporation acquired the business and properties of Tennessee Packing and Provision Company, including the registered trade-mark "Old Hickory," thereafter used as a trade-mark for ham, bacon, sausage, lard, and other products processed by the corporation.

Neuhoff Packing Company improved its plant and steadily expanded its business until, by 1930, a large volume of fresh and processed meats and by-products of slaughtered animals was being sold by it in an extensive territory in Tennessee and Alabama, and in a smaller territory in Kentucky, Virginia, North Carolina, Georgia and South Carolina. Valuable good will had been built up by the Neuhoff company to such extent that Swift and Company desired to acquire its properties and good will. Swift's offer being acceptable, a contract in writing was entered into between that company and Neuhoff Packing Company on November 8, 1930. This contract was subsequently rejected by a vote of the stockholders of Neuhoff Packing Company "for Federal income tax purposes," and a new and somewhat complicated plan of sale was formulated.

In January, 1931, the stockholders of Neuhoff Packing Company adopted a resolution expressing their desire to liquidate the corporation; and, by action of the directors, the corporate name of the company was changed by charter amendment of January 8, 1931, to "Nashville Provision Company." Between January 1 and January 3, 1931, the directors of Neuhoff Packing Company declared a dividend in kind of the fixed assets of the company, as described in a schedule to the contract with Swift and Company of November 8, 1930, which the stockholders had rejected.

In payment and satisfaction of this dividend in kind, Neuhoff Packing Company conveyed to its stockholders by deed dated January 7, 1931, all the fixed assets *including the company's good will, trade rights, trade-marks, trade names, and the right to use the corporate name, "Neuhoff Packing Company."* On the same date, Swift and Company submitted, in writing, an offer, *unconditionally accepted by all stockholders of Neuhoff Packing Company,* to purchase for a consideration of $1,600,000 in cash the assets, good will and properties set out in the schedule to the agreement of November 8, 1930, with the understanding that the

stockholders were to perform the obligations imposed upon Neuhoff Packing Company in the contract of November 8, 1930, to the same extent as if the corporation had seen fit to accept and perform the contract.

At the instance of Swift and Company, a charter of incorporation was obtained on January 8, 1931, from the State of Tennessee for "Neuhoff Packing Company," and its entire authorized capital stock of $2,000,000 was paid up in cash by Swift and Company. Other auxiliary transactions were consummated on the same date. White Provision Company (a Georgia corporation owning a packing plant in Atlanta), in which the old Neuhoff Packing Company was a large stockholder, conveyed its assets to a nominee of Swift and Company; Nashville Cold Storage Company, a subsidiary of the old Neuhoff Packing Company, also conveyed its assets to Swift's nominee; and the old Neuhoff Packing Company, whose name had been changed to Nashville Provision Company, assigned and transferred to the newly incorporated Neuhoff Packing Company its entire right, title and interest in and to the registered trade-mark "Old Hickory."

Also, on January 8, 1931, Lorenz Neuhoff, Arthur Neuhoff and Lorenz Neuhoff, Jr., delivered to Swift and Company their separately executed agreements that they would not, for a period of fifteen years, directly or indirectly in person, or as stockholders, directors, or employees, of any corporation, or otherwise, engage or become interested in any business competing or liable to compete in any way with the business theretofore conducted by the Neuhoff Packing Company in Kentucky, Tennessee, Alabama, Georgia, Florida, North Carolina and South Carolina, except in those portions of the states named where no business was being carried on by the Neuhoff Packing Company at the time its liquidating dividend was declared.

On January 9, 1931, all stockholders of the old Neuhoff Packing Company (incorporated in 1906 and re-incorporated in 1930), in consideration of the $1,600,000 paid to them by Swift and Company, delivered to the newly incorporated Neuhoff Packing Company a deed which, in addition to the real estate conveyed therein, transferred personal property of the old Neuhoff Packing Company, then called Nashville Provision Company, "including but not being limited to, the good-will of said business and all trade rights, trade marks, *trade names,* brands, formulae, inventions, patents and interests therein, and patent licenses and contracts in respect to said inventions, patents, interests and licenses, and all switch or side tracks, and agreements relating thereto owned and/or used by the Neuhoff Packing Company, now the Nashville Provision Company, in the operation of its business, and *the right to use the corporate name of the Neuhoff Packing Company.*" [Italics supplied.] All cash, bills, notes, accounts receivable, merchandise and supplies were excluded from the conveyance, which was expressly made to the grantee and its successors and assigns forever.

Since acquiring the business of the old Neuhoff Packing Company, the appellee has vigorously expanded its operation; and has expended much money in plant enlargement and construction, in the installation of modern machinery and improvement in processing, and in the purchase of automobiles and delivery trucks. More than 300,000 head of livestock are slaughtered yearly; and the annual gross business transacted by appellee exceeds $8,000,000. The company employs some 625 persons in office work and plant operation, and sends out twenty traveling salesmen to solicit orders.

The automobiles used by its salesmen are painted a distinctive orange with blue trim, and "Neuhoff Packing Company, Old Hickory Brand," is painted in blue letters on the outside panel of each door. Likewise, this color scheme is carried out in the painting of its delivery trucks and the trade name "Neuhoff" and the trade-mark "Old Hickory" are prominently displayed thereon. The name "Neuhoff" and the trade-mark "Old Hickory" have been featured by large signs painted on the walls of a hundred buildings, more or less, in and around Nashville and along the highways of Tennessee. These names have been featured, also, in radio advertising, by frequent pronouncement of them in describing

the company's numerous products. A dozen of its leading brands are labelled and advertised under the name "Neuhoff's Old Hickory Brand," followed by a description of the product, with a statement that it is manufactured by "Neuhoff Packing Company, General Office, Nashville, Tenn."

We turn now to the activities of the originators of Neuhoff, Inc., and of the appellant corporation which they created.

It should be recalled that Lorenz Neuhoff, Jr., had been a stockholder of the old Neuhoff Packing Company (organized in 1906 and re-incorporated in 1930) and had joined with all the other stockholders in the execution of the deed of January 9, 1931, conveying to appellee the property therein described "and the right to use the corporate name of Neuhoff Packing Company." In May, 1933, Lorenz Neuhoff, Jr., together with J. B. Harris and H. W. Cole, obtained a Virginia charter for "Neuhoff, Incorporated." The three named incorporators, with Lorenz Neuhoff, were named as officers and directors of the corporation, the principal office of which was to be located at Lynchburg and later, by charter amendment, at Salem, Virginia. Broadest powers were vested in the corporation to handle and deal in livestock and meat products, including processing, and the right to operate an abattoir and packing house.

During the thirteen years from 1933 to 1946, the gross amount of the business of Neuhoff, Incorporated, increased to approximately $8,250,000. Not until 1946 did Neuhoff, Incorporated, come into competition with the Neuhoff Packing Company. In that year, however, the appellant acquired the plant and properties of the Acme Provision Company, located in Bristol, Virginia, on the borderline of Tennessee.

In late September of 1946, appellant, through its attorney at Union City, Tennessee, forwarded to the Secretary of State of Tennessee an application for a charter to be issued to "Neuhoff, Incorporated, of Tennessee." The state official replied, by letter, stating that the Neuhoff Packing Company had been a corporation since January 8, 1931, and that it would be impossible to issue another Tennessee charter authorizing the use of a similar corporate name without the consent of the first corporation.

Having failed to procure the desired Tennessee charter, appellant filed in the office of the Secretary of State of Tennessee a certified copy of its Virginia charter, paid the required fees for domestication of a foreign corporation, and received a certificate evidencing its qualification to do business in Tennessee.

On October 4, 1946, the appellant corporation purchased the real estate, buildings, plant equipment and assets of Reynolds Packing Company in Union City, Obion County, Tennessee. Since it qualified to do business in Tennessee, appellant has come into competition with the appellee at Bristol, Johnson City, Kingsport, and Elizabethton, all in Tennessee. Deliveries have been made in trucks acquired from the Acme Provision Company, which are painted distinctively orange and black. Five salesmen travel and sell the products of Neuhoff, Incorporated, in this territory. Since October, 1946, appellant has also been and is now actively competing with appellee for business in Hopkinsville, Kentucky, and Clarksville, Waverly and Dickson, Tennessee, and in territory adjacent to these cities. Salesmen from appellant's plant at Union City, Tennessee, travel and solicit orders in this trade territory. Appellant also competes with appellee in Nashville, Tennessee, where it has stationed a headquarters salesman.

Delivery of its products sold in Middle and West Tennessee is made from appellant's plant at Union City in trucks acquired from the Reynolds Packing Company on which are painted in large letters, on the lower left-hand corner of the truck panel, the words "Neuhoff, Inc.," followed by "Union City, Tenn." The trucks are painted a different color from that used by appellee. On invoices of the company, "Neuhoff, Inc., Union City, Tenn.," is imprinted by rubber stamp over the printed words at the top, "Invoice Reynolds Packing Co., Union City, Tennessee." Appellant advertises, labels and sells its products under numerous trade names, about half of which contain the word "Neuhoff's." On all

labels on which the name "Neuhoff's" appears, there is printed, "Neuhoff, Inc., Union City, Tenn."

A portion of the district court's extensive findings of fact contain inferences which might appropriately label them mixed findings of fact and conclusions of law. These particular findings, however, are of value in revealing the rationale upon which the district judge deemed it his duty to grant injunctive relief. It would, therefore, seem advisable to quote them directly:

"On many of the cartons and labels on meat products manufactured and sold by Neuhoff, Incorporated in competition with the same line of business conducted by Neuhoff Packing Company the name 'Neuhoff' is very prominently displayed. On others it is not so prominently displayed. The effect of that is that an ordinary layman going into a retail store to purchase a package of bacon, a package of sausage, or a package of prepared meat, and seeing on it a label with large letters 'Neuhoff's' and being familiar with the trade name of 'Neuhoff' in this territory, would not stop to read down through the label or carton to see whether or not Neuhoff Packing Company of Nashville, Tennessee, or Neuhoff, Inc. Bristol, or Neuhoff, Incorporated, Union City, Tennessee, processed the meat in that package. That is borne out by the fact that appears from the affidavits in this case that several stores that have been in business and handling meat products, apparently for some time, have gotten the companies mixed up themselves and sent checks to one when they should have been sent to the other. A layman going into a store to buy processed meat products, seeing the name 'Neuhoff' prominently displayed on the packages and knowing the quality of Neuhoff meats that are on the market, would go no further and would be satisfied. He would think that he was getting meat prepared by Neuhoff Packing Company in Nashville, Tennessee, and take it and go his way, probably never knowing the difference.

"The name 'Neuhoff' has been associated with the meat packing and processing business in Middle Tennessee since 1889. It was exclusively used as the trade name under which the processed products of the Neuhoff Brothers, the Neuhoff Abattoir and Packing Company, Inc., and the old Neuhoff Packing Company, until it sold its business in 1931, were advertised and sold. And, beginning in the year 1911 the name 'Neuhoff' was featured in the advertisement and sale of processed products in connection with the registered trade-mark 'Old Hickory.' And so the business had become generally known to the trade, both retail and wholesale, under the said advertised names of 'Neuhoff,' 'Neuhoff's,' and 'Neuhoff's Old Hickory Brand'; and likewise known to manufacturers, wholesalers and retailers, in other states by said names.

"John Neuhoff, a brother of Henry Neuhoff and Lorenz Neuhoff, for several years, and until his death, engaged in the selling of meats in a stall in the Market House in Nashville and did business in his own name, but he was engaged only in the retail business and did not compete with his brothers, Henry and Lorenz Neuhoff, or with Neuhoff Abattoir and Packing Company, Inc., or with the old Neuhoff Packing Company (organized in 1906 and re-incorporated in 1930), or with Neuhoff Packing Company (organized January 8, 1931), in the wholesale business of processing and selling meat, meat products and by-products.

"Neuhoff Packing Company has been well and widely known in the territory where it does business for a great many years—certainly since 1906. It has always manufactured and sold a good product, and there has always been a demand on the market for Neuhoff products, because almost everyone knows about these products. Its meat products have been widely advertised, and since complainant purchased the business of the old Neuhoff Packing Company in 1931 the name of Neuhoff has been as well known as it was before that date.

"The name 'Neuhoff' is a rather unusual name in Tennessee and in other Southern States where complainant sells its products in interstate commerce between the State of Tennessee and such other states. It is a name that attracts attention and particularly attracts the attention of a prospective purchaser of meat products. By reason of its unusual character the name is easy to remember and it is a very valuable name as a trade asset, particularly on account of the

advertising that has been given it and the prominence it has had in complainant's selling territory for the past 58 years.

"When Neuhoff, Incorporated obtained its Charter from the State of Virginia in 1933 Lorenz Neuhoff, Jr., as principal organizer, authorized said corporation to use his family name as its corporate name. * * *

"The corporate name of the defendant 'Neuhoff, Incorporated' is not such as to distinguish it from the complainant, 'Neuhoff Packing Company.' On the contrary, the defendant's corporate name is so similar to complainant's corporate name that it is calculated to deceive and mislead the public; that it is calculated to cause and has caused confusion; that it infringes on complainant's property rights in the corporate name 'Neuhoff Packing Company' and the trade names 'Neuhoff' and 'Neuhoff's'; and that it has caused and will continue to cause annoyance and inconvenience to complainant. The Court finds that there is no actual fraud in this case, but that the use of the word 'Neuhoff' by defendant in its corporate name and trade names amounts to constructive fraud on the complainant."

Numerous instances of confusion between Neuhoff, Incorporated, and Neuhoff Packing Company were found by the district court to have occurred in the trade territory established by appellee. Telephone calls, letters, and many orders and checks intended for the appellant corporation were received by the appellee. Freight bills for products shipped by appellant were also received by the Neuhoff Packing Company. The record discloses that during a two-year period frequent confusion of this sort caused much inconvenience to the appellee.

A widely distributed pictorial prospectus prepared by the Bristol, Virginia-Tennessee, Chamber of Commerce erroneously referred to the Acme Provision Company as a division of the Neuhoff Packing Company. A Bristol customer of the packing company who entertained a grievance against Neuhoff, Incorporated, stopped buying the appellee company's products because of the thought that Neuhoff, Incorporated, of Salem, Virginia, and Neuhoff Packing Company of Nashville, Tennessee, were one and the same company.

Both parties to this litigation buy cattle at auction sales in Tennessee, where as many as 1200 head go through the auction ring in one day. Because of the similarity of the names, Neuhoff, Incorporated, and Neuhoff Packing Company, the two bidders often are incorrectly identified in announcement of the name of the successful one. Frequently, the auctioneer simply says, "Bought by Neuhoff." Even when the auctioneer correctly calls out the name of the successful bidder, yard boys who handle the cattle sometimes become bewildered and place the cattle purchased by one bidder in the pen assigned to the other.

■ The hearing in the district court was on appellee's motion for a preliminary injunction. It was stipulated by the parties that the affidavits filed should be treated as depositions and that the hearing on the motion should be treated as a final hearing. The decree entered is, therefore, a final judgment, from which this court has jurisdiction to entertain an appeal.

■ The injunction, which was suspended by the district judge pending the outcome here, restrains appellant, its officers, agents, and employees, from directly or indirectly doing business or having any dealings anywhere in Tennessee under the corporate name "Neuhoff, Incorporated," or any other corporate name in which the word "Neuhoff" appears. The appellant was ordered not to use the names "Neuhoff" and "Neuhoff's," singly or in combination with another or other names, in advertising and selling its manufactured products; and was forbidden to display these words upon its cartons and packages. Likewise, the injunction ran against the use of the names "Neuhoff" and "Neuhoff's" in connection with the manufacture or sale by appellant of any products similar to those of appellee. Moreover, appellant was enjoined from using trucks, automobiles, or other conveyances with the forbidden names appearing thereon. *The operation of the injunction in its entirety was expressly and properly limited to specified territory in the states of Tennessee, Kentucky, Virginia, Alabama, Georgia, North Carolina, and South Carolina—the trade territory of the appellee.*

The law of the case presents little difficulty. The appellant contends that "a man's name is his own property and there must be a clear and unequivocal intention to divest himself of the right to use his own name before he can be enjoined from using it in a business transaction in a reasonable, honest and fair way." The following authorities are cited in support of the statement: National Distillers Products Corporation v. K. Taylor Distilling Co., D. C., 31 F.Supp. 611; Piggly-Wiggly Corporation v. Saunders, D.C., 1 F.2d 572 (decree modified, however, in Saunders v. Piggly-Wiggly Corporation, 6 Cir., 30 F.2d 385, 388, 389); Robinson v. Storm, 103 Tenn. 40, 48, 49, 52 S.W. 880; Howe Scale Company v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 135, 25 S.Ct. 609, 49 L.Ed. 972; Brown Chemical Company v. Meyer, 139 U.S. 540, 544, 11 S.Ct. 625, 35 L.Ed. 247; Stix, Baer & Fuller Dry Goods Co. v. American Piano Co., 8 Cir., 211 F. 271; Hazelton Boiler Co. v. Hazelton Tripod Co., 142 Ill. 494, 30 N.E. 339; Blanchard v. Simon, 104 Va. 209, 51 S.E. 222.

It should be observed that, in the very first case cited by appellant, District Judge Ford issued a perpetual injunction restraining the defendant from using the name "Taylor" in its corporate name on any advertising matter or whiskey labels, unless accompanied by a statement plainly and specifically showing that the defendant is "neither the successor to nor connected with the maker of 'Old Taylor' whiskey"; and that its product is "not the product of E. H. Taylor, Jr., & Sons, or its successors." This direction resulted from the finding of the court that the defendant had engaged in unfair competition in the use of the name "Taylor," although it had elected as its president Kenner Taylor, one of the three members of the Taylor family who had organized the original corporation of E. H. Taylor, Jr., & Sons, which, upon the death of Kenner Taylor's father, had sold out its business, including trade names, trade-marks and control, to the National Distillers Products Corporation. D.C., 31 F.Supp. 611, 616.

It is noteworthy that, on appeal from the district court decision in the Piggly Wiggly case cited by appellant, this court made it

clear that Saunders was not privileged to use his own name in such manner as to deceive the public or to deprive the plaintiff of the benefits of the rights, privileges and good will of the business originated by Saunders, extensively advertised, and sold to the plaintiff. 6 Cir., 30 F.2d 388.

In Stix, Baer & Fuller Dry Goods Co. v. American Piano Co., supra, cited by appellant, the Circuit Court of Appeals for the Eighth Circuit stated that, while it was settled beyond controversy that a family surname may not be appropriated where such name has become known in trade, the second user may not affirmatively do anything to cause the public to believe that his article is the product of the first manufacturer and, therefore, must exercise reasonable care to prevent the public from so believing, or from believing that he is the successor in business of the first manufacturer. 8 Cir., 211 F. 274.

In our opinion in John T. Lloyd Laboratories, Inc. v. Lloyd Brothers Pharmacists, Inc., 6 Cir., 131 F.2d 703, 707, we cited the Brown Chemical Company case, supra, to the point that a man's name being his own property, he may use it reasonably, honestly, and fairly, without liability for any incidental damage inflicted upon a business competitor. We also cited the Howe Scale Company case, supra, to the proposition that, in the absence of restrictive contract, fraud, or estoppel, any man may use his own name as the whole or a part of a corporate name.

In Waterman Co. v. Modern Pen Co., 235 U.S. 88, 94, 35 S.Ct. 91, 59 L.Ed. 142, cited by appellant, Mr. Justice Holmes declared that there is no distinction between corporations and natural persons in the principle that, when the use of his own name upon his goods by a later competitor will and does lead the public to understand that those goods are the product of a concern already established and well known under that name, and when the profit to him of the confusion is known to or intended by the later man, the law will require him to take reasonable precautions to prevent the mistake.

█ This court has discussed the principles pertaining to the law of unfair com-

petition on numerous occasions, and has exhaustively reviewed the authorities upon the subject. For present purposes, we are content to refer to only one of our many opinions in this field: Hemmeter Cigar Co. v. Congress Cigar Co., 6 Cir., 118 F.2d 64, 70, wherein we stated that, in cases of unfair competition, similarity of names need not be shown to be such as would actually deceive persons seeing two commodities side by side. It was made plain that, to obtain the aid of a court of equity, it is sufficient for the suitor to show that the ordinary or unwary purchaser, and not the cautious and discriminating one, might be deceived by the similarity in name or appearance.

The opinion of the Supreme Court in Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526, long followed as a guiding authority from the highest source, asserts that when a partner retires from a firm the good will of the business and the right to use the old name and to possess the old place of business is retained by the other partners, if the retiring partner gives his assent or acquiescence.

■ It is to be understood, of course, that, under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, if the law of the state in which occurred the acts sought to be enjoined is at variance with the federal rule, the substantive law of the state will prevail and must be applied in the federal courts.

But from our study of its opinions, we find that the Supreme Court of Tennessee and this court have been in constant consonance in exerting effective equitable restraint upon proven acts of unfair competition. The Tennessee court has been especially zealous in guarding against the unfair use by anyone of his own family name in competitive trade. Three of that court's determinative decisions will now be reviewed.

The important facts disclosed in Robinson v. Storm, 103 Tenn. 40, 47, 48, 55, 52 S.W. 880, were that, in 1872, an eminent Memphis physician, Dr. Mitchell, finding need for a vegetable cathartic which could be substituted for calomel, took a formula to an educated pharmacist, Robinson, for experimentation to find such aromatics as might make a liquid compound palatable to patients. After much effort, Robinson worked out a combination satisfactory to the doctor who, without any claim to proprietary interest, frequently prescribed the medicine as "Comp. Elix. Leptandra." Such prescriptions for his patients were invariably directed to be filled by Robinson's drug firm. One of the earliest of these prescriptions was given to a river-boat captain, Ad Storm, who, being greatly benefited by the medicine, recommended it to many friends, with the result that it soon became a popular remedy in Memphis and along the Mississippi River. After a short time, with the consent of Captain Storm and as a compliment to him, Robinson's firm placed the medicine upon the market conspicuously labelled, "Storm's Liver Regulator." For a quarter of a century, Robinson sold the preparation under such designation and built up a favorable reputation for it throughout a wide territory.

After the death of Captain Storm, his only son, who was neither a druggist nor a chemist, secured a formula from a Memphis druggist for a medicine sold as "Goodyear's Liver Tonic," and caused a liquid mixture based on its ingredients to be prepared in St. Louis and shipped to Battier, another Memphis druggist, for distribution among the retail druggists of that city. The bottles and cartons were labelled in large display type, "Storm's Liver Regulator." At the foot of the cartons appeared the words, "Prepared by eminent chemists for A. G. Storm," followed by the words, "This is not the medicine put up by James S. Robinson." The arrangement, however, was such as to make it more likely that the eye of a purchaser would be attracted by the name "Robinson" in the place where the name of the owner of a proprietary medicine ordinarily appears than it would be by the word "not" in the line of negation. The cartons varied in color from those of Robinson, but not sufficiently to put the average purchaser on guard. The court thought it immaterial that there was no such imitation of labels and cartons as would deceive an expert, or even an ordinary observer, when the cartons of Robin-

son and those of Storm were placed side by side, the test being whether the simulation was such as to be likely to deceive an incautious and ordinary purchaser.

Chief Justice Beard quoted with approval language from Higgins v. Higgins Soap Co., 144 N.Y. 462, 39 N.E. 490, 27 L.R.A. 42, 43 Am.St.Rep. 769, to the effect that, notwithstanding the fact that the law protects the right of a man to use his own name in his own business though another who has established and gained a reputation for a business under that name is injured, the courts require that the names be honestly used and permit no artifice or deceit designed or calculated to mislead the public and to palm off the business as that of the person who first established it and gained its reputation. The Supreme Court affirmed the decree of the Chancellor enjoining the younger Storm from using, in connection with the manufacture, sale, and advertisement of his medicine, the words "Storm," "Captain Storm," or "Ad. Storm," in collation with the words "liver regulator" upon his bottles, wrappers, cartons, packages, or otherwise.

It would extend this opinion to undue length to narrate in detail the facts of Sandford-Day Iron Works v. Machine Co., 130 Tenn. 669, 682, 692, 172 S.W. 537. A manufacturer, succeeding to the rights of the original makers of car wheels, which for half a century had been known to the trade as "Whitney wheels," was granted an injunction against a rival manufacturer which had employed Asa W. Whitney, a relative and former employee of the original manufacturers, restraining the advertisement of its wheels as "Whitney Wheels," "A. Whitney Wheels," or "Asa W. Whitney Wheels," and from using the name "Whitney," either alone or in connection with other words or initials in advertising or selling its wheels, except as directed in a restrictive decree. The defendant was permitted to state that it had procured the services of Asa W. Whitney and to describe his duties and the nature of his employment; to advertise his knowledge, skill and experience in metallurgy and in compounding ores; and to state that he was a member of the Whitney family, brought up in the business by the originators of the Whitney Wheel; and otherwise to state the facts.

The opinion of the Tennessee court stated that the general proposition that every man has the right to use his own name in his own business even though someone else of the same name has previously been engaged in a similar business under that name had been subjected to much qualification. It was pointed out that the recent cases were uniform in holding that one's own name must not be used as an artifice to mislead the public as to the identity of the business or the corporation. Authoritative reference was made to Robinson v. Storm, supra, and to decisions of the Supreme Court of the United States. The state courts were said to be uniformly in accord.

This brings us to a consideration of the Tennessee case in which the Supreme Court of that state affirmed a decree of injunction restraining to the fullest extent the use by a man of his own name in unfair trade competition. M. M. Newcomer Co. v. Newcomer's New Store, 142 Tenn. 108, 217 S.W. 822. To a correct understanding of the wide scope of the injunction a discussion of the facts of that case is necessary.

M. M. Newcomer and John E. Lewis, partners doing business as M. M. Newcomer & Co., conducted a ladies' garment business in Knoxville, Tennessee. In 1907, a corporation was organized under the name "M. M. Newcomer Company," to which, in consideration of stock issued to them, the partners conveyed the partnership assets and property, including "their name and good will." Newcomer became vice-president, secretary, and residential manager of the corporation. An extensive trade in Knoxville, throughout East Tennessee, and in portions of Kentucky and North Carolina was enjoyed, many customers being served through mail orders.

Under Newcomer's management, the business of the corporation was heavily advertised in newspapers and in various other ways featuring always the names "Newcomer," or "Newcomer's." A large lettered sign on the front of its store building at 402-410 Gay Street bore the inscription, "M. M. Newcomer & Company, M. M. Newcomer's Department Store, 41 Stores under One Roof." A large electric sign

"Newcomer's," hung from the store building across the sidewalk; and the company's delivery wagons, likewise, carried in large letters the same inscription. Newcomer, himself, stated that the name "Newcomer's" was used for the reason that if he could train the public to refer to the store as "Newcomer's," it would be much easier to attract customers than to teach them to trade with "M. M. Newcomer Company," or "The M. M. Newcomer Company." He said that in reading signs over places of business and in looking through newspapers for advertisements, people search for the catch phrases instead of reading the small print.

In 1918, M. M. Newcomer sold his stock in M. M. Newcomer Company and severed his connection with that corporation, in the organization and management of which he had actively participated. With associates, he obtained a charter for a new corporation, styled "Newcomer's New Store," and opened a store at 508 Gay Street in Knoxville, selling to the retail trade ladies' ready-to-wear garments.

Much confusion between the old company and the new ensued. Mail, telegrams, orders, freight and express packages were frequently wrongly delivered. Orders intended for M. M. Newcomer Co. were, in many instances, filled by Newcomer's New Store. The proof showed that the confusion caused dissatisfaction and complaint among some of the older company's customers.

M. M. Newcomer Co. obtained an injunction restraining Newcomer's New Store from using that name in the conduct of its business; whereupon, the defendant dropped the word "New" from its signs and advertising. The defendant corporation was then enjoined from using the name "Newcomer's Store." Following this, the defendant used for its business the name and the expression, "M. M. Newcomer, in no way connected with the M. M. Newcomer Company or Newcomer's Department Store." This usage was restrained and an injunction was issued against the "Newcomer's New Store" corporation, its stockholders, officers and directors, forbidding the use of the name "M. M. Newcomer" in connection with the business.

Both the Court of Civil Appeals and the Supreme Court of Tennessee, on certiorari, affirmed this decree of the Chancery Court.

 In a well considered opinion, the state Supreme Court discussed the pertinent principles and cited many authorities. The dominant language of the court directly applicable here reads thus: "The rule is general that a corporation may not adopt as its corporate name a name similar to the trade-name of a person or concern previously engaged in a similar business, where its use of that name will have the effect of deceiving or misleading the public. [Citing numerous authorities.] * * * It has been held that it is not necessary to prove that the public has actually been deceived by the similarity in names. It is the liability to deception and consequent injury which justifies the issuance of an injunction. If the court can see that confusion and deception is liable to result from the similarity of names it will not refuse injunctive relief because the damage has not already been done." 142 Tenn. 118, 120, 217 S.W. 825.

Upon the controlling authority of the Tennessee decisions, it becomes clear that the judgment of the United States District Court in the instant case should be affirmed. Accordingly, it is so ordered.