**HOLLISTER, INCORPORATED**

v.

**TRAN-SEL, INC. and Lorene Laugherty.**

**Civ. A. No. 4434.**

United States District Court
E. D. Tennessee, N. D.

Sept. 9, 1963.

142

H. M. Harton, Jr., Knoxville, Tenn., William J. Stellman, James R. Sweeney, Hofgren, Brady, Wegner, Allen & Stellman, Chicago, Ill., for plaintiff.

Ivan T. Privette, Knoxville, Tenn., J. Preston Swecker, William L. Mathis, Washington, D. C., for defendants.

ROBERT L. TAYLOR, Chief Judge.

Hollister, Incorporated, an Illinois corporation, with principal place of business in Chicago, Illinois, has sued Tran-Sel, Inc., a Tennessee corporation with principal place of business in Knoxville, Tennessee and Lorene Laugherty, individually, who is a citizen of Knoxville, Tennessee, for damages for infringement of U. S. Letters Patents D–190,157 and D–190,787 issued respectively on April 25, 1961 and June 27, 1961 and, in a second cause of action, for unfair competition. An injunction was requested. During the course of the trial, plaintiff abandoned its claim for damages and now seeks only a permanent injunction requiring modification of the alleged infringing devices to end the alleged confusion between the products of the two parties.

The plaintiff will be referred to herein as Hollister; the defendant Tran-Sel, Inc., as Tran-Sel; and the defendant Lorene Laugherty, as Laugherty. Patent D–190,157 will be referred to as '157; and Patent D–190, 787, as '787.

The defenses as to the patents are invalidity and noninfringement; and as to the second cause of action that there has been no unfair competition. Defendant Tran-Sel in a counterclaim charged plaintiff with violation of the antitrust laws in bringing suit for patent infringe-

ment and unfair competition against former employees who engaged in competition with plaintiff.

Each patent was for a design, No. '157 to Bowen being for a "Holder for Cards Prescribing a Hospital Patient's Treatment;" and No. '787 to Schneider being for an "Umbilical Cord Clamp." Under Title 35 U.S.C. § 171, "Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefore, * * *."

## No. '157, The Bed Sign Patent

The invention claimed in No. '157 was for an overall ornamental design for a hospital bed sign. The device as disclosed comprised a plastic holder with four slots and transparent windows for each behind which could be inserted an identification card for the patient and three additional cards indicating the condition of the patient or treatments to be given him. There was nothing new about its function, the plaintiff having prior to 1961 marketed a flat bed sign containing these features. No. '157 tilted the windows so that when the holder was fastened to the bed or wall the information behind the transparent window could be more easily read.

Sales by the plaintiff of products covered by the '157 patent in suit for the last several years have been considerable and approximate 18,000 per year.

Plaintiff is extensively engaged in the hospital supply business and sells products throughout the United States, Canada and several foreign countries. Other companies in the hospital supply field have been and are selling bed signs for patient identification purposes. The flat bed sign sold by plaintiff prior to the sign claimed in No. '157 is still available. The sales of the bed sign covered by the '157 patent in suit have far exceeded the sales of the flat bed signs.

Defendants have relied upon the following patents as anticipating claims of the patents in suit:

| Patent No. | Inventor | Issue Date |
|---|---|---|
| Des. 129,502 | Wright | Sept. 16, 1941 |
| 652,771 | Harte | July 3, 1900 |
| 661,325 | Roth | Nov. 6, 1900 |
| 1,418,787 | Grambow | June 6, 1922 |
| 1,659,509 | Ashbrook | Feb. 14, 1928 |
| 8,096 | British Pat. | 1910 |
| 301,615 | Swiss Pat. | Nov. 16, 1954 |
| 475,488 | Italian Pat. | Oct. 30, 1952 |

The Italian patent 475,488, issued October 30, 1952, was the principal one relied upon by defendants as anticipating the claims of the patent in suit. This patent covered a small sign having a slanted slot for receiving price information. The overall appearance of the small sign show in the Italian patent is similar to the appearance of a single tier or section of the sign shown in the Bowen patent in suit.

Various kinds of bed and other similar signs have been in use for many years. It must be borne in mind that Patent No. '157 does not claim the function of the device depicted therein, only its design. We find no patent among those cited which precisely anticipates the design of No. '157 although there are obvious similarities both in function and appearance. But this is not enough. Section 171 requires that the design be "new, original and ornamental."

In Thabet Mfg. Co. v. Kool Vent Metal Awning Corp., 226 F.2d 207, 211, 212 (C.A. 6), our Court of Appeals said:

"* * * The statute contemplates appearance rather than utility. The thing invented for which a design patent is given is that

which gives a distinctive appearance to the article to which it may be applied. Gorham [Mfg.] Co. v. White, 14 Wall. 511, 81 U.S. 511, 524–525, 20 L.Ed. 731; Cavu Clothes v. Squires, Inc., 6 Cir., 184 F.2d 30, 32–33.

"A design patent must disclose inventive originality in design and ornamentation; mere mechanical skill is no more sufficient to constitute inventive art in the case of the design artist than in the case of the engineer. Capex Co. v. Swartz, 7 Cir., 166 F.2d 5, 6; Western Auto Supply Co. v. American-National Co., 6 Cir., 114 F.2d 711; Cavu Clothes v. Squires, Inc., supra.

"A design patent must be possessed of novelty; the adaptation of old devices to new purposes, however convenient or useful they may be in their new role, is not invention. Western Auto Supply Co. v. American-National Co., supra; Imperial Glass Co. v. A. H. Heisey & Co., 6 Cir., 294 F. 267. *The degree of difference required to establish novelty occurs when the average observer takes the new design for a different, and not a modified already existing design.* Application of Johnson, 175 F.2d 791, 792, 36 C.C.P.A., Patents, 1175; Application of Abrams, 205 F.2d 202, 203, 40 C.C.P.A., Patents, 1045. *The fact that a design may be distinguished from those found in the prior art does not import the required novelty and ornamentation; its overall aesthetic effect must represent a step which has required inventive genius beyond the prior art.* Burgess Vibrocrafters, Inc., v. Atkins Industries, 7 Cir., 204 F.2d 311, 314."

The Court went on to say that although there was a difference in general appearance, it did "not regard the difference as substantial enough to have required the exercise of the inventive faculty."

In Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 696 (C.A. 2), the Court said:

"* * * Of course, the mere fact that a person has utilized in combination a number of elements which severally were well known will not defeat the patentability of the combination. Graff, Washbourne & Dunn v. Webster, 2 Cir., 1912, 195 F. 522, 523. But the utilization of old elements in combination must represent an exercise of inventive skill and creative talent beyond that of the ordinary designer chargeable with knowledge of the prior art. International Silver Co. v. Pomerantz, 2 Cir., 1959, 271 F.2d 69, 71; General Time Instruments Corp. v. United States Time Corp., 2 Cir., 165 F.2d 853, 854, certiorari denied 1948, 334 U.S. 846, 68 S.Ct. 1515, 92 L.Ed. 1770. What plaintiff did amounted to nothing more than an unstartling regrouping of old elements which demonstrated no originality born of inventive faculty. This is not enough. Knickerbocker Plastic Co. v. Allied Molding Corp., 2 Cir., 1950, 184 F.2d 652, 655. It is not sufficient that plaintiff has shown the talent of an adapter; a manifestation of the art of the inventor was required. * * *"

See also Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 618 (C.A. 2); Burgess Vibrocrafters v. Atkins Industries, 204 F.2d 311, 314 (C.A. 7); Gorham Mfg. Co. v. White, 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 531; Smith v. Whitman Saddle Co., 148 U.S. 674, 13 S.Ct. 768, 37 L.Ed. 606; Elite Mfg. Co. v. Ashland Mfg. Co., 235 F. 893 (C.A. 6).

With these standards in mind, the Court is of the opinion that No. '157 does not show inventive originality in design and ornamentation. Although the design of the patent may be distinguished from the design of the flat sign sold by plaintiff long before the Bowen patent application, the overall effect of the design shown in the patent does not show advancement in the design of bed

signs which required inventive genius beyond the prior art. The only substantial difference between the design of the Bowen patent in suit and the design of the flat bed sign marketed by plaintiff for many years is the slanted slot feature which was induced by functional considerations rather than design novelty. As was indicated in Elite Mfg. Co. v. Ashland Mfg. Co., supra, the creation of a bed sign with tilted slots did not call for an exercise of the creative faculty. Originality is wanting. The beauty, or in terms of the modern statute, the "ornamental" quality, of the design is not impressive. The patent must be held invalid.

Tran-Sel has manufactured and sold, since the issuance of the '157 patent in suit and prior to the filing of this action, a bed sign substantially identical with the bed sign shown in the '157 patent in suit, and if we are mistaken in our conclusion that the bed sign is not patentable, then the bed sign manufactured and sold by defendant, Tran-Sel, Inc., infringes the bed sign manufactured and sold by the plaintiff.

### No. '787, The Cord Clamp Patent

The invention claimed in No. '787 is the overall ornamental design for a funis clamp used to tie off the umbilical cord of a new born infant. Sales by plaintiff of cord clamps covered by No. '787 for the last several years have approximated 1,250,000 items per year. The mechanical cord clamp structure of plaintiff's product was invented by Drs. Kariher and Smith of Rochester, New York. An application covering this structure is still pending in the Patent Office and the right to manufacture and sell the clamp upon which patent application is pending is licensed to the plaintiff.

Briefly, this clamp, made of nylon, is an integral device with two arms approximately two inches long which are hinged at one end by a half loop and which are adapted to be fastened together at the other end by a tongue and keeper arrangement. The contiguous, inner sides of the arms are grooved crosswise in a series of teeth which mesh together and shut off leakage when the two arms are clamped and fastened around the funis by the attending physician.

Samples of the clamps produced by the physicians have been examined by the Court and received in evidence. The degree of difference between the Schneider clamp and the clamp produced by the physicians is such that an average observer would consider the patented design a mere modification of the clamps devised by the physicians. The ornamental effect, if any, attributed to the cord clamp of the patent does not represent inventive genius beyond the prior art.

After entering into the licensing agreement with Drs. Kariher and Smith, John Dickinson Schneider, the alleged inventor named in the '787 patent, undertook to change the cord clamp so as to make its mouth deeper and thereby hold the clamp firmer, making the device safer to use. This change related solely to the function of the clamp rather than to its ornamental appearance. There is no substantial difference in design between the cord clamp shown in the '787 patent in suit from the Drs. Kariher and Smith structure.

Moreover, plaintiff's advertisement, shown in Defendants' Exhibits 7, 8 and 9 and Plaintiff's Exhibit 29 which issued more than one year prior to the time of the application for Patent '787, shows substantially the same design as the cord clamp in Patent '787.

In addition, the cord clamps advertised by plaintiff in the November, 1959 issue of the publication "Obstetrics and Gynecology" and the November, 1959 issue of "The Modern Hospital," which publications were mailed to subscribers in due course on November 12 and 13, 1959, respectively, were sold by plaintiff during the months of September, October and November, 1959. Mr. Schneider testified that the cord clamps sold by plaintiff during these months differed from the cord clamps of his patent in that one

part of the structure for latching the clamp in its closed position was thinner than the corresponding part of the clamp of the patent. The part pointed to by Mr. Schneider was a small internal part affecting the function of the cord clamp and embodies no significant advance as far as the appearance is concerned. The cord clamps illustrated in the November, 1959 issue of "The Modern Hospital" and "Obstetrics and Gynecology" are the same in appearance as the cord clamps illustrated in plaintiff's Patent '787.

■ We are of the opinion that the cord clamps shown in the advertisement and in the patent applications of Drs. Kariher and Smith anticipate the invention of Patent '787 in suit. We are further of the opinion that the cord clamp of the '787 patent embodies no new, original and ornamental design for an article of manufacture which is a proper subject for design patent protection. See the cases cited above under the discussion of the Bed Sign Patent.

Defendant, Tran-Sel, Inc., has manufactured and sold since the issuance of the '787 patent in suit and prior to the filing of this action a cord clamp substantially identical to the cord clamp shown in the '787 patent in suit and if the '787 patent is a valid patent, then it has been infringed by the defendant Tran-Sel and its Vice President and one of its chief stockholders, Lorene Laugherty.

### Unfair Competition—Breach of Confidential Relationship

The unfair competition count is based on 28 U.S.C. § 1338(b) [1] and upon diversity of citizenship. The Court is of the opinion that it has jurisdiction under either theory.

The basis of the claim of plaintiff that defendants are guilty of unfair competition is two-fold: First, that Miss Laugherty appropriated confidential information which she obtained from plaintiff while occupying a position of trust

and used this information in furtherance of defendant's business, and second, that defendant palmed off the goods of Tran-Sel on the public as the goods of Hollister.

Miss Laugherty was employed by plaintiff during the period from February, 1959 until March, 1960. She began as a salesman at a salary of $110.00 per week. Her original territory was Tennessee, Kentucky and Northern Alabama. She worked as a salesman throughout her period of employment by the plaintiff. In August, 1959, she was given additional duties and her pay was raised to $225.00 per week. She made $11,700 per year at the time she quit plaintiff. Much of her time after August, 1959 was used in traveling with newly employed sales representatives to demonstrate to them how she contacted potential buyers and sold them plaintiff's products. She carried on interviews alone and with executives of plaintiff with applicants for employment as sales representatives. She was not a policy-making executive of plaintiff. She had no authority to act independently in the execution of any established policy of plaintiff. She could not hire or fire employees. She hired only with the approval of Schneider or Miss McDonald. She did not have a written contract of employment. She was not told that any information given to her was confidential or secret. She was not asked to agree not to disclose to others any information given to her. She terminated her employment with plaintiff in March, 1960 because she was tired of continual travelling and wanted to return home.

Following her employment with Hollister, Miss Laugherty established two employment agencies in Louisville and Lexington, Kentucky. These she sold in the fall of 1960. It was not until January, 1961 that defendant Tran-Sel was organized. She has taken an active part in it since the beginning. She and Carl Martin own about 41% of the stock.

1. "(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trademark laws".

She is Vice President of the company which markets hospital supply products in competition with plaintiff. She was given a black book containing lists of hospitals and notations as to sales information when she started to work for the plaintiff. Each salesman was given a like book which contained pertinent information used by the salesmen in the territory that he covered. She turned in the black book when her employment terminated with plaintiff and has never had it in her possession since. Tran-Sel has operated as a mail order business basing its entire program on mass mailings of literature to hospitals. Such literature is sent to all hospitals listed in standard, generally published directories and to no others. Miss Laugherty testified that she made no personal calls. The information contained in the black book was not used by the defendants in any manner.

The parties seem not to dispute that the Tennessee law applies. Neuhoff, Inc. v. Neuhoff Packing Co., 167 F.2d 459, 466 (C.A.6).

Plaintiff contends that the Tennessee law imposes a strict rule on former employees against their competing unfairly with their former employers and in support of the rule relies on the case of Kelly Mfg. Co. v. Brower, 1 Tenn.App. 428. In this case, Brower worked for Kelly Manufacturing Company for a time and after leaving he and Warner began to manufacture and sell a machine embodying the principal structure and operation of the Kelly machine. Brower and Warner were enjoined from continuing in their business. The Court held that defendants gained knowledge of the technical parts of the machine under a special or confidential relationship and that it was unfair for them to profit from such knowledge.

Another case relied upon by plaintiff is that of Hall et al. v. Britton, 41 Tenn. App. 72, 292 S.W.2d 524. The principle announced in the Kelly case was reaffirmed in the Hall case. The Court stated in the Hall case that when a person obtains information of a confidential nature in his employment which enables him to manufacture a product in competition with his employer, "and of such nature as to be calculated to deceive the purchasing public, as to whose product they might be purchasing, he is under such an obligation, by virtue of his employment, that he should be restrained from performing such business to the detriment of his former employer." 41 Tenn.App. 72, 87, 292 S.W.2d 524, 530. See also Midland-Ross Corporation v. Yokana, 293 F.2d 411, 413 (C.A.3); Gaye v. Gillis, 167 F.Supp. 416, 419 (D.C. Mass.)

It is clear from this evidence that Miss Laugherty's relationship to the Hollister Company during the period of her employment was not of the confidential nature discussed in the cases cited above. The cord clamps and bed signs were sold to the public by the thousands. Hollister's advertising of both products was widely circulated, and the information contained in its sales literature was also widely known. The evidence does not indicate that Miss Laugherty obtained any secret lists of customers. She and another witness testified that the Tran-Sel customer lists were taken from directories of hospitals available to anyone. She denied that she used any information from the "black books." The Court concludes that the conditions of Miss Laugherty's employment were such that she obtained and used no information of a nature which would support the charge of unfair competition

## Unfair Competition—Palming Off

The bed signs and cord clamps sold by Tran-Sel are similar in general appearance to the bed signs and cord clamps sold by Hollister. The signs and clamps sold by Tran-Sel are permanently marked "Tran-Sel." The signs and cord clamps sold by Hollister are permanently marked "Hollister." The names on the bed signs are plainly discernible but this cannot be said of the names on the cord clamps. However, the cord

clamps are shipped in cartons to the buyers which contain the plain lettering:

"UMBILICAL
Cord-Clamps
by
KNOXVILLE, TENNESSEE
TRAN-SEL, INC."

This lettering is sufficient to prevent confusion upon the part of the buyer.

Some portions of the advertising used by Tran-Sel are similar to portions of advertising material used by Hollister but such material is easily distinguishable as the names and addresses of the companies are conspicuously different.

Miss Laugherty does not personally solicit potential customers of Tran-Sel and her name does not appear on the Tran-Sel literature or sales correspondence. She does not contact customers and the fact that she once worked for Hollister could not lead anyone to buy from Tran-Sel on the mistaken assumption that he was buying from Hollister.

The charge of actual confusion of buyers has not been proved. The record indicates that plaintiff made extensive efforts to find a buyer that had been confused. In spite of telephone calls to purchasing agents of various hospitals in an effort to show confusion, the only evidence offered was that of the depositions of Mrs. Thayer, a nurse in a New Hampshire hospital and Mr. Piazza, who was purchasing agent of the Ronsonville General Hospital. Mr. Piazza's hospital mailed two orders to Tran-Sel in Knoxville, Tennessee for bed signs. It is hard to understand how he could be confused. These two orders signed by him were mailed to Knoxville, Tennessee. He knew or should have known that if his hospital was purchasing from Hollister that such orders would have been mailed to Hollister in Chicago.

Mrs. Thayer was not a buyer. She indicated that she was confused about the origin of some cord clamps used in the hospital. But she did not order any cord clamps from any company. Miss Dorothy Dane, Director of Nurses, did the ordering. In fact, Mrs. Thayer's hospital never bought cord clamps from Hollister. The cord clamp orders received by Tran-Sel from the actual buyer, Miss Dane, were mailed from Tran-Sel in Knoxville and, of course, she could not have believed that she was buying from Hollister in Chicago.

In Jack Daniel Distillery, Lem Motlow, Prop., Inc. v. Hoffman Distilling Co., 298 F.2d 606, 607 (C.A.6), our Court of Appeals said:

"It was not unlawful for Ezra Brooks to copy unpatented products of Jack Daniel so long as they are properly identified and do not mislead the public into believing that Ezra Brooks' products are those of Jack Daniel. * * *"

In West Point Mfg. Co. v. Detroit Stamping Co., 222 F.2d 581, 595–596 (C.A.6), the Court said:

"The essence of unfair competition is the practice of palming off one's product as that of another. There is no allegation in the bill of complaint that appellant was guilty of such conduct; and there was no proof to sustain such a charge, if it had been made. Moreover, in its findings and orders in this case, the district court did not find or hold that appellant had been guilty of misrepresenting the source of its products or palming them off as those of appellee.

"Appellant copies appellee's product as it had a right to do. It impressed upon that product its own trade-mark in place of the trade-mark that appeared on appellee's product. Anyone looking at the clamps could easily see which bore appellant's trade-mark, and which bore appellee's trade-mark. In fact, the president of appellee company, under examination by his counsel, testified why he thought that there was 'opportunity for confusion' as a result of the production and distribution of a clamp identical to appellee's clamp, which bore appellant's trade-mark. The reason he

gave was that appellee's distributors had inquired of appellee whether appellant, because of its trade-mark affixed to the clamps it manufactured, was distributing the clamps made by appellee. Because appellant's trade-mark on its clamp prompted such a question does not indicate that appellant had not sufficiently differentiated its clamp from appellee's clamp. The fact that such questions were asked shows that doubt was thrown into the minds of appellee's own agents as to the origin of the clamp because of appellant's trade-mark affixed thereto. It was not necessary for appellant to affix further information to its clamp, beyond its trade-mark, in order to avoid confusing the public as to the producer or source of the product. How a purchaser exercising reasonable care could be deceived into buying a clamp plainly marked with the name and trade-mark of appellant in the belief that it was buying appellee's clamp is beyond comprehension. The advertisements in which appellant used a picture of a clamp reproduced from photographing one of appellee's clamps, clearly disclosed, in large and prominently displayed lettering, that appellant was the manufacturer; and there also appeared on the clamp, so reproduced, appellant's trade-mark. There could be no confusion of source, or of producer, from appellant's advertisements. Any purchaser exercising ordinary care could not have been confused as to the manufacturer of appellant's clamps; and there is no evidence that the public or any purchaser was interested as to who was the manufacturer of the clamps."

The same Court, through Judge (now Mr. Justice) Stewart, said in Tas-T-Nut Co. v. Variety Nut & Date Co., 245 F. 2d 3, 5 (C.A.6):

"* * * when a patent covering an article of manufacture has expired, the original manufacturer cannot prevent another from making and marketing an exact copy of the article, so long as the other does not deceive the public by passing off his product as that of the original manufacturer. * * *"

The Court went on to say 245 F.2d at page 6 with respect to packaging:

"The rule expressed in the West Point case does not preclude the appellant from securing relief from the appellee's conduct, if the appellant's trade dress has acquired a secondary meaning. The difference in the protection against imitation which will be accorded to an article of commerce on the one hand, and to a package in which the article is marketed on the other, was long ago noted. Writing for the Supreme Judicial Court of Massachusetts in Flagg Mfg. Co. v. Holway, 1901, 178 Mass. 83, 59 N.E. 667, that court's then Chief Justice Oliver Wendell Holmes pointed out that the law which permits one to market an identical copy of his competitor's product does not give him freedom to imitate the appearance of the package in which the article is sold. As there pointed out, the public policy which permits the imitation of an article of commerce is without relevance to the dress in which the the article is marketed. '* * * [T]he label or ornament is a relatively small and incidental affair, which would not exist at all, or at least would not exist in that shape but for the intent to deceive; whereas the instrument sold is made as it is, partly at least, because of a supposed or established desire of the public for instruments in that form.' 178 Mass. 91, 59 N.E. 667."

The Court of Appeals for the Second Circuit has discussed the problem in Feathercombs, Inc. v. Solo Products Corp., 306 F.2d 251, 257 (C.A.2), in the following language:

" 'The Feathercombs' patent being invalid, it is clear that Solo had every right to market a comb similar

or identical to that marketed by its competitor. But it is also clear that the law placed upon Solo an obligation to advertise, display, and promote its products so as not to be unduly confusing to the average consumer. See Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 619 (2 Cir. 1962). The fact that Solo abandoned its familiar red and yellow display background, dropped the trade name "Solo" from its place of usual prominence and adopted a format almost identical with Feathercombs' when it was clear that the products would be displayed near each other on merchandising counters and would attract the same group of females, is ample evidence of its intention to tread upon the good will of Feathercombs.

" 'It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of [his] competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.' Florence Mfg. Co. v. J. C. Dowd & Co., 178 F. 73, 75 (2 Cir. 1910).

" 'In this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.' Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F. 2d 755, 758 (2 Cir. 1960). We note that Feathercombs, aside from its ownership of a valid trademark, has no monopoly upon any one of the improvements of its packaging and display devices. But, in determining whether there is likelihood of confusion, we must examine all of the components taken as a whole."

■■ Whether there is a palming off or growth of a secondary meaning is a question of fact. We are satisfied that unpatented articles, or ones—as here—which are invalid for lack of design invention, may be manufactured and sold provided there is no palming them off as articles of the original manufacturer. In our case, the proof fails to show that the cord clamps and bed signs marketed by Hollister have acquired a secondary meaning in the trade. Nor do Tran-Sel's sales methods and packaging constitute a palming off of its products for those of Hollister. Tran-Sel's business address is in an entirely different part of the country and the fact it sells exclusively by mail is a guarantee of this. Without repeating what we have said, the record is devoid of credible evidence that there was any confusion among the buyers of the two products.

### Counterclaim

■ Tran-Sel, Inc., as counterclaimant, charges that Hollister has unlawfully and willfully interfered with its relation with its customers by bringing an unjustified and unfounded suit for patent infringement against Tran-Sel and its customers; that Hollister has unlawfully and willfully used its claim of ownership of U. S. letters patent as a trade weapon in an attempt to eliminate Hollister's lawful competition in the sale of unpatented articles whereby Tran-Sel, Inc., has been and is being unlawfully deprived of the right to compete freely with Hollister in the field of unpatented articles; that Hollister has monopolized or attempted to monopolize a part of the trade or commerce among the several states in hospital supplies and has thereby injured the business of Tran-Sel, Inc. in violation of the antitrust laws of the United States. 15 U.S.C. §§ 2 and 15.

Hollister has not filed any suit against any of Tran-Sel's customers; nor has it accused any of Tran-Sel's customers of patent infringement. The present suit of Hollister against Miss Laugherty is its third suit against former employees accusing them of using information acquired in a trust relationship with Hollister in competition with the sale of Hollister products. Patent infringement was also charged along with unfair competition in one of the suits. In that suit, which was tried in the United States District Court for Arizona, the District Court held that the patent was valid and infringed, but also held that the proof was insufficient for a finding of unfair competition.

The proof in the present case is insufficient to show that Hollister has monopolized or attempted to monopolize or combined or conspired with any other person to monopolize any segment of the hospital trade. Its own portion of the hospital trade is a modest one. The Court concludes that Tran-Sel's counterclaim is not well founded in law.

One other matter involved in the suit requires brief mention. Shortly before the first trial date set, plaintiff gave notice to defendants' counsel that it would take the depositions of Piazza and Thayer in New Hampshire and New Jersey. Defendants' counsel requested the Court to deny plaintiff's request to take the depositions due to the lateness of the notice or in the alternative to require plaintiff to pay the attorneys' fees and expenses of defendants' counsel in the taking of the depositions. The Court reserved decision on this question until final determination of the suit. The Court denies defendants' request for attorneys' fees and expenses incurred in the taking of these depositions with some reluctance.

In summary, it is the judgment of the Court that plaintiff recover no damages and that its prayer for an injunction be denied. It is further the judgment of the Court that defendants' counterclaim be dismissed and that the request for attorneys' fees and expenses incurred in the taking of certain depositions be denied.

Let an order be presented which conforms with the views herein expressed.