FLETCHER HALL and CEDACOTE CORPORATION
v. JAMES L. BRITTON, JAMES GORDON and PROD-
UCTS RESEARCH CORPORATION.—292 S. W. (2d)
524.

Western Section. December 2, 1953.

Petition for Certiorari denied by Supreme Court April 16, 1954

74

Snowden, Davis, McCloy, Donelson & Myar, Memphis, for original complainants.

Glascock & Miller, Memphis, for original defendants.

AVERY, J. This is a suit instituted in the Chancery Court of Shelby County by Fletcher Hall, an individual and Cedacote Corporation against James L. Britton and James Gordon, as individuals and jointly, and against Products Research Corporation. The parties will be referred to with the designation of the status they had in the lower court.

Complainants, sought to restrain the defendants from "manufacturing, advertising, or selling its product known as 'Cedrbrix' and from using in any way the confidential information or trade secrets acquired by defendants Gordon and Britton from complainants," and to recover any loss which the complainants may have sustained by virtue of defendants having manufactured and sold "Cedrbrix."

The essence of the complaint is set out in the second paragraph of the original bill, which is as follows:

"That complainants bring this suit to prevent the defendants from appropriating certain trade secrets and confidential information, gained in the course of and employment by complainants, for the use and benefit of the defendants to the irrefutable detriment of the complainants."

The original bill alleges, and the proof is sufficient to establish the fact, that Fletcher Hall discovered a formula for the preparation of a mixture containing cedar wood oil to give off the aroma of cedar wood, and which was originally planned to be applied like paint, to wall surfaces of closets, drawers, chests, etc., which he designated as "Cedacote" and that he applied to the United States Patent Office for that trade name which was granted by Registration No. 378414, and sold the product through a company designated "Cedacote Manufacturing Company" in New York; that he also discovered a formula by which he processed material in the form of a small rectangular block to be placed in closets and drawers, which he designated as "Cedar Block", and sold it until May 1951; that thereafter the same material was manufactured in the shape of a disk and designated as "Cedadisk," and that through the same corporation this article, "Cedadisk," was sold.

From the exhibit on file, the "Cedar Block" was about $2\frac{3}{4}'' \times 1\frac{3}{4}'' \times \frac{1}{4}''$, and the "Cedadisk" had a diameter of about $2\frac{1}{2}''$ and was about $\frac{1}{4}''$ thick. The Cedacote Corporation had the exclusive contract to market these products for Hall throughout the United States. Hall mixed the ingredients from which these items were molded. They were put into certain type little boxes and display containers, calculated to attract public attention by the general retail trade. Samples of these containers and little boxes are filed with the record, properly identified as exhibits. Both Hall and the Cedacote Corporation, at the time this bill was filed, and some time prior thereto, were located in Memphis, Tennessee, with their places of business adjoining each other so that the ingredients might be mixed by Hall and his employees and imme-

diately turned over to the corporation to be molded, packaged and marketed.

In July 1951 James Gordon was employed by the Cedacote Corporation as factory superintendent and continued as such until November 1952, in which capacity he had an opportunity to learn about these products. In July of 1952 when the manufacture of the ''Cedadisk'' began, James Gordon was given a sort of a dual employment, working a portion of the time for Hall in the mixing process and a portion of the time for the corporation in the molding and packaging processes. In October he notified the offices of the Corporation that he was going to quit and work for his brother-in-law, but agreed to stay until a new superintendent could be found. The new man was found and scheduled to begin work November 17, but Gordon quit his work on November 4, 1952.

In August of 1952 defendant James L. Britton applied to the Cedacote Corporation for employment as a salesman, and the sales manager took him on some trips with him in September and October, and on October 1 an agreement was entered into with Britton whereby he became exclusive selling agent for the states of Arkansas, Louisiana, Alabama, Georgia and Tennessee, on a commission basis, and certain duties and trips were planned for the month of October, but Britton never made any effort to perform under his contract, and upon investigation he told the officers of the corporation that he had decided not to work for complainants. When this occurred an investigation revealed the fact that James L. Britton, Jerry W. Britton and John B. Rehm had applied for and been granted a charter of incorporation under the name of Products Research Corporation, by the State of Tennessee, that complainants learned that James L. Britton

was president and James Gordon vice president and that the defendant corporation immediately began the manufacture of and preparation to sell an imitation of complainants' product in the shape of a block, designated "Cedrbrix" as a trade name, and procuring a carton somewhat similar to that in which complainant sold its product "Cedadisk."

This product "Cedrbrix" is of practically the same dimensions as the hereinabove described product, "Cedar Block," almost the same color and gives off the same odor. Though some of the "Cedrbrix" containers were made by the Products Research Corporation, the record does not reveal any sales by it prior to the issuance of the temporary injunction in this proceedings, and of course none thereafter, but does reveal a determined effort to manufacture and market that product.

The answer by the defendants denied the appropriation of "any trade secrets and confidential information gained in the course of and employment by complainants or otherwise, deny that they have used same to their benefit, and deny that any irrefutable detriment has been caused to the complainants."

The answer admits the employment by James Gordon substantially as set out in the original bill, but denies that he learned any of the secret processes or methods used by the complainants, and denies that in fact they had any secret processes but that the products used by the complainants and the defendants, in the manufacture of their respective items was such as are "customarily used by the industry in manufacturing the same or similar products; that there was nothing new, novel, different, or unusual about the methods, processes, formula or manner

of making, mixing, using or blending any of the materials used by the defendant while an employee of complainants or either of them." It also denies that Hall revealed any confidential information about his production or that he kept it secret from the public.

The case was tried in the Chancery Court of Shelby County before the Honorable L. D. Bejach, Chancellor, upon oral testimony, the Chancellor so ordering upon application of the complainants.

The Chancellor announced his opinion and finding of facts to the effect that the defendants were guilty of misconduct and breach of confidence imposed in them while they were employed by the complainants and that the material allegations of the bill had been sustained by preponderance of proof. In his opinion he states that he observed the manner and the demeanor of the witnesses Britton and Gordon while on the stand and in applying the same rule to himself in determining the credibility of the witnesses, as he would have instructed a jury to do had the case been tried to a jury, he had reached the conclusion that both of the witnesses and particularly Britton "represent the most consummate examples of crooks, sharpers and schemers it has been the fortune of this court to observe since it has been on the bench for nearly twenty years." In the opinion of the court, they were completely discredited. The court comments on the similarity of the product and the cartons in which they are placed for sale. He granted the permanent injunction, as prayed in the bill and adjudged the cost against the defendants, and a decree was entered in accord with the opinion.

Appeal was prayed and granted by the defendants, and seasonably perfected to this Court, and the record has been preserved by a bill of exceptions.

In the outset it should be said that the record does not disclose the formula used in the mixture of the products marketed by complainants and the ones proposed to be marketed by defendants, nor any of the material used in their manufacture, except the rather obvious ingredient, "cedar oil." The exhibits themselves could not be examined by this Court or a customer without obtaining such knowledge. Neither of the parties chose to disclose their formula to the Court, and the Court did not require such disclosure. There was no description of the mixing processes, but it is obvious that both concerns were producing a plastic solid capable of being saturated with cedar oil that would give out the odor of cedar wood for a long period of time, and in a demonstration process the defendant produced a plastic solid, which is also exhibited with the record, in open court.

This Court will consider the issues in this case as they were considered by the parties to this suit. In their respective statements of the case, counsel for both parties have well stated the issues, in their respective briefs.

The defendants (appellants) state the issue to be:

"The main issue to be decided in this lawsuit, is, are the appellants to be perpetually enjoined from further manufacture of their product 'Cedr Brix' upon the charge that appellants had fraudulently used appellees' secret process in said manufacture, where the appellees refused to divulge their secret process, admittedly did not know the process used by the appellants, and offered no proof of this kind,

type, and character of appellants' product, except as to use and approximate size?

"The secondary issue is one of alleged unfair competition. The appellees charge that the name of appellants' product, its form, and its packaging is a *crude* imitation of its product and calculated to deceive the buying public.

"The question to be decided then is:

"Would a casual buyer be deceived to the extent that he would purchase appellants' product believing it to be that of appellees'?"

The complainants (appellees) state the issues to be:

"(1) May an employee who is employed by a person using a secret process, and to whom the secret is divulged in confidence as a necessary incident to his employment, be enjoined from later using such confidential information for his own benefit or divulging it to a third person to the detriment of his former employer?

"(2) Does it constitute unfair competition for a former employee, who learned in confidence the trade secrets of his former employer, to market a product so similar in name, purpose, and appearance to the secret process product of his former employer that the ordinary, casual buyer will be misled to accept the imitation for the original?"

The complainants abandoned any effort to recover damages on the hearing of this cause, which confined the hearing strictly to that of an injunction proceedings.

The defendants have assigned what they designate as six assignments of error. The response to these assignments of error by the original complainants generally treats them somewhat combined. It is well said by the counsel for complainants that "assignments of error Nos. I, II, III, IV, and VI by appellants are directed at challenging the Chancellor's findings of fact." These five referred-to assignments of error are so closely related that in this opinion they will be treated together. The assignment of error V challenges the right of the Chancellor to grant injunctive relief.

It should be further said, at this point that under complainants' "Propositions of Law" it is stated that "the findings of fact by the Chancellor are conclusive where there is material evidence to support them." In support of this proposition of law counsel relies upon Silver Fleet Motor Express, Inc., v. Carson, 188 Tenn. 338, 219 S. W. (2d) 199, and Troutt v. Troutt, 35 Tenn. App. 617, 250 S. W. (2d) 372.

We do not agree with that proposition of law.

As stated above, this cause was tried according to the forms of chancery and the review in this Court is governed by Code Sections 9036, 10620-10622. Under 9036 the appellant is entitled to a re-examination of the whole matter of law and fact appearing in the record. Under 10620 and 10621 both the Chancellor and the Court of Appeals must file written findings of fact. Under 10622 there is a prima facie presumption of correctness of the judgment or decree of any lower court in non-jury cases and the judgment or decree will not be disturbed unless the evidence preponderates against the correctness of same. McCalla v. Rogers, 173 Tenn. 239, 243, 116

S. W. (2d) 1022; Cole v. Walker, 25 Tenn. App. 392, 158 S. W. (2d) 57; Joest v. John A. Denie's Sons Co., 174 Tenn. 410, 126 S. W. (2d) 312; Perry v. Carter, 188 Tenn. 409, 219 S. W. (2d) 905.

■ In numerous cases will be found various expressions, such as in the cases cited above by appellee, to the effect that the findings of the Chancellor or of the Trial Judge, who saw and heard the witnesses, etc., is entitled to great weight, or is well nigh conclusive, or is conclusive (on appeal). These expressions mean simply that the appellate court will not substitute its judgment as to the credibility of witnesses, under such circumstances, where there is nothing else in the evidence such as documentary evidence or evident self-contradiction of the witness, or irreconcilable impeachment of the witness, or testimony contrary to facts of which the court should take judicial notice or other matter to overcome the presumption of correctness of the judgment or decree below. Vide, Haralson v. Jones, 33 Tenn. App. 572, 232 S. W. (2d) 415; Nashville Corp. v. United Steelworkers, etc., 187 Tenn. 444, 452, 215 S. W. (2d) 818.

Such expressions, however, are not intended to negate the manner of review provided by the statutes, but are evidently merely descriptive of the practical situation, where the trial court has had an advantage in weighing the evidence that it is not possible for the appellate court to have under the stated circumstances.

The answer to the issues, as stated by the respective counsel and hereinabove quoted, will properly determine the facts of this case. The law seems to us to be without complications when related to proper factual situations.

There was, in the literal sense of the meaning, a process which complainant Hall and Cedacote Corporation regarded as a secret. This secret of processing required a space separate from the molding, packaging and distributing floor or space. It was convenient for the mixing process to be near the molding, packaging and distributing floor or space. Hall and the marketing corporation had their respective operations in the same building. Hall first made a substance that had to be put on wood as paint a good many years ago. Thereafter he perfected his ''Cedacote'' which was a paste or plaster substance with some twelve different ingredients, which could be applied to wood or paper. He obtained a trade mark for that product. The distinct result was to have a substance that would continually give off the aroma or odor of cedar wood. Thereafter he discovered a process by which he made the ''Cedar Block'', consisting of some five or six ingredients, and with the idea expressed by the distributor, this process used in the ''Cedar Block'' structure was used to make the ''Cedadisk,'' which apparently differs only in shape from the ''Cedar Block.'' The quality nor quantity of the ingredients nor the way they were mixed were revealed by Hall to the officers or employees of the corporation, nor to any one else, except one Negro man who worked for Hall prior to the time Gordon was employed to help him, and Gordon himself. Gordon saw the substance, he understood the amount of each substance that went into the mixture and he knew the name or designation of the substances because they were bought on the open market and the containers evidently showed what was in them. In addition to that knowledge Hall states that he taught Gordon what this formula was, used in making the ''Cedadisk.'' Hall's statement is that ''I told him everything, how to mix it

and mold it throughout the whole operation.'' Hall regarded this formula as a very strict secret and he states that:

"I told him (Gordon) he should not reveal it to anyone, and that it was a secret,'' and "to reveal it to no one regardless of who they were.''

In that process Hall used a "fixative" to preserve the cedar oil in the plastic solid so that the odor would linger longer. Hall had been working with this process, perfecting it into different thicknesses, solids and shapes since 1928, the "Cedar Blocks" in 1943 or 1944 and the "Cedadisks" a little later.

Mr. J. C. Bruce, secretary of Cedarcote Corporation and president of Bruce Carton Company states that he was familiar with the circumstances around the employment or hiring of James Gordon; that he met Gordon through a friend, Mr. Rainey, who was a half brother of Gordon; that Gordon was employed in June of 1951 as superintendent; that he, Bruce, recommended Gordon to Mr. Hall mainly because Cedacote did not have enough work to keep him busy all the time; that Hall first declined because he was careful about who he employed in the mixing of his product which was a secret formula; that Hall was approached by him and by Mr. Darnell about three times before he was accepted by Hall as a part-time employee; that Hall quit abruptly and left the key on his desk on the morning of the presidential election in 1952.

Next witness Darnell testified that the first contract with Mr. Hall, by the corporation was for the exclusive right to distribute his product known as "Cedacote" and the second contract was for the right to distribute

his molded block product under the name of "Cedadisk." He was questioned at length about the contract with Britton, stating that Britton was employed as a manufacturer's agent. He stated that Gordon was employed as factory superintendent and after some while when the company entered into the second contract with Mr. Hall that Gordon was employed to assist Mr. Hall in preparation for the "Cedadisk," Gordon having additional duty which was the actual molding of the "Cedadisk" and that thereafter Gordon replaced the Negro helper working for Hall; that Hall did not want to employ Gordon, but was persuaded to do so; that Gordon had told him that he knew the mixing process, and that whether Hall was there or not he could mix it identically as it had been done by Mr. Hall, and that he knew the process perfectly. While Gordon worked in that dual capacity he was paid for part-time by Hall and part-time by the corporation.

This witness also detailed the circumstances in connection with the hiring of Britton, and the contract made with him, that Mr. Britton made a trip with a Mr. Milo, acting under his contract and detailed the facts with respect to Britton's employment about as related in the original bill.

The employment of Britton furnished him an opportunity to at least observe the molds in which the product designated "Cadadisk" were made. Just exactly what information he got from the inside of the factory, by personal observation, is not revealed.

The evidence to the effect that Gordon and Britton obtained the secrets of Hall while employed either by the corporation or by Hall and the corporation, insofar as Gordon is concerned, is reinforced by the circumstances

under which Gordon and Britton quit their jobs. A further circumstance of what they intended to do, even before they quit their work, or at least before Gordon quit his work with the corporation and Mr. Hall, is the fact that they together with a relative of Britton's procured a charter for a new corporation with authority to do about what Hall was doing and also what the Cedacote Corporation was doing.

■ The Chancellor saw the witness on the stand, and while we hold that this case must be decided by a preponderance of the evidence, we do feel constrained to give great weight to the opinion of the Chancellor, and taking into consideration that fact, together with the surrounding circumstances, we conclude and find that the facts substantiate the material charges set forth in the bill.

Having found that Hall did have a secret process for the manufacture of these materials known as "Cedacote," "Cedar Block" and "Cedadisk," and apparently informed his employees that it was a secret, and having found that Gordon and Britton obtained their information from Hall and from the Cedacote Corporation, the only other question to be determined is whether or not the product they proposed to manufacture and designated as "Cedrbrix" was made from approximately the same materials and process, and packaged so that it might deceive the public in the purchase of the articles, thinking when they purchased the product of the defendants they were purchasing the product of complainants.

■ We think and so find that based upon the similarity of color, size, containers, size of containers, color scheme of containers, that the average purchaser might

purchase either product, thinking that they were purchasing the other.

■ When one is employed by another, and through that employment he obtains information of a confidential nature which enables him to manufacture a product, in competition with his employer, and of such nature as to be calculated to deceive the purchasing public, as to whose product they might be purchasing, he is under such an obligation, by virtue of his employment, that he should be restrained from performing such business to the detriment of his former employer. Kelly Manufacturing Co. v. Brower, 1 Tenn. App. 428; E. I. DuPont de Nemours Powder Co. v. Masland, 244 U. S. 100, 37 S. Ct. 575, 61 L. Ed. 1016; Junker v. Plummer, 320 Mass. 76, 67 N. E. (2d) 667, 165 A. L. R. 1453; Matarese v. Moore-McCormack Lines, 2 Cir., 158 F. (2d) 631, 170 A. L. R. 449.

■ In a suit involving a trade secret it is not always necessary to reveal the secret in order to substantiate the contention of a party, where the secrets are known to the parties because of their former confidential relationship. E. I. DuPont de Nemours Powder Co. v. Masland, supra. Elaterite Paint & Manufacturing Co. v. S. E. Frost Co., 105 Minn. 239, 117 N. W. 388.

■ To constitute unfair competition the product of defendants need not be an exact copy of complainants, but need only be so reasonably similar in appearance, use and name so as to cause an unwary purchaser to confuse the products. C. F. Simmons Medicine Co. v. Mansfield Drug Co., 93 Tenn. 84, 23 S. W. 165.

■■ We think the assignment of error number "V" challenging the right of the Chancery Court to grant an injunction in cases of this character is without merit.

It is true that injunctive relief being extraordinary in character should be granted with great caution and only after full and ample evidence that it is necessary. This record reveals facts which make such relief necessary.

This record is convincing in regard to the intention of Britton and Gordon, along with their new corporation, to manufacture and sell their produce ''Cedrbrix'', in competition with the complainants' product, ''Cedadisk.'' Britton had approached the buyer at one of the department stores in Memphis, and had made other overt acts in his effort to create a purchasing desire for his product. The expense of the corporate formation and all circumstances in the case show conclusively that their effort was to compete with the complainants. Ceasing work for the complainants by Gordon, Britton's design to obtain employment by the corporation with sinister motives and failure to perform under his contract, and as stated by the Chancellor, the evasive attitude shown by both Gordon and Britton, as witnesses, is evidence of their corrupt intentions. The injunctive relief sought is nothing less than an equitable remedy pursued by complainants, in an effort to legally protect their own business against such onslaught as the record reveals.

The result is, therefore, that all assignments of error are overruled, the decree of the Chancellor affirmed, the defendants perpetually enjoined as provided by the decree of the Chancellor and taxed with the cost of the cause. Decree will be entered accordingly.

Swepston, P. J. (W. S.), and Carney, J., concur.