**FERRARI S.P.A. ESERCIZIO FABRICHE AUTOMIBILI E CORSE**

v.

**Carl ROBERTS, d/b/a Roberts Motor Company.**

**No. CIV–2–88–73.**

United States District Court,
E.D. Tennessee,
Northeastern Division.

April 27, 1990.

Cleary, Gottlieb, Steen & Hamilton (Jonathan I. Blackman and Lawrence B. Friedman, of counsel), New York City, Robin, Blecker, Daley & Driscoll (Albert Robin, of counsel), New York City, Baker, Worthington, Crossley, Stansberry & Woolf, Johnson City, Tenn. (Ed E. Williams III, Robert D. Van de Vuurst, of counsel), for plaintiff.

Shumate & Bowling (W.F. Shumate, Jr. and Bobby Bishop, Jr., of counsel), Richard S. Wirtz (pro hac vice), University of Tennessee College of Law, Knoxville, Tenn., for defendant.

## MEMORANDUM OPINION

HULL, Chief Judge.

This is an action for unfair competition in which the plaintiff (Ferrari) alleges that its unregistered trademarks have been infringed by the defendant (Roberts).[1] The trademarks at issue are claimed in the exterior

---

1. For convenience, the defendant will be referred to as "Roberts," referring in shorthand fashion to the business principally involved in this case, Roberts Motor Company. Nevertheless, the Court wishes to make clear that the defendant is an individual doing business as a proprietorship and not a partnership or corporation.

shapes and features of two of Ferrari's automobile models, the 365 GTB/4 (Daytona Spyder) and the Testarossa. Accused of infringing these alleged trademarks are two of Roberts' automobile models, the Miami Spyder and the Miami Coupe. For relief, Ferrari requests an injunction enjoining Roberts from manufacturing and marketing the Miami Spyder and the Miami Coupe, or any vehicle that imitates the bodies of the Daytona Spyder and the Testarossa; an equitable accounting; and an award of attorneys' fees. Proceeding under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Tennessee common law, this case came on for trial without a jury on April 10, 1990. Based on all the evidence from the trial, the Court renders the following findings of fact and conclusions of law.

## I.

Ferrari is the well-known manufacturer of widely acclaimed racing automobiles and grand touring cars. Based in Modena, Italy, the company intentionally limits production of its road cars, striving for an image of exclusivity. In 1989, for example, Ferrari produced 3,821 vehicles, shipping 853 of these to the United States. Ferrari markets its automobiles in North America through 43 authorized dealers.

Between 1969 and 1973, Ferrari produced an automobile known as the 365 GTB/4 Daytona. Of the approximately one thousand four hundred Daytonas built, most were close-bodied; *i.e.*, coupes or berlinettas. Although approximately 100 were originally built as soft-top convertibles ("Spyders"), many berlinettas were later converted into Spyders. Because the vehicle at issue is the Daytona Spyder instead of the Daytona Berlinetta, this memorandum opinion refers to only the Spyder. Since the introduction of the Daytona Spyder, Ferrari has continuously produced mechanical parts and body panels and provided service to repair the vehicle. Daytona Spyders currently sell for one to two million dollars.

Introduced in 1984, the Testarossa continues to be manufactured by Ferrari to the present day. Ferrari has produced approximately 5,000 Testarossas since the vehicle's introduction. The entire production of the Testarossa is sold out for the next several years and the waiting period to receive one is typically five years. The sales price for a new Testarossa is approximately $230,000.00.

From his facility in Kingsport, Tennessee, Roberts conducts several business ventures, most of which relate to the automobile industry. One enterprise Roberts has engaged in since 1985 is the marketing of a vehicle currently known as the Miami Spyder. This automobile's exterior is virtually identical to the body of a vehicle constructed by Al Mardikian and Tom McBurnie and used on the popular television series "Miami Vice." The body of the Mardikian/McBurnie automobile is in turn virtually identical to the exterior of Ferrari's Daytona Spyder.

Roberts advertises his Miami Spyder in nationally published magazines catering to the automobile and replica automobile industries. In exchange for $15.00, a respondent to Roberts' advertisement receives a picture of the Mardikian/McBurnie automobile and an informational pamphlet showing the various components of the Miami Spyder. Although Roberts has constructed several "turnkey" Miami Spyders, the majority of them are sold as kits. The principal component of this kit is a one-piece body shell molded from reinforced fiberglass. This body is usually bolted onto the undercarriage of a Chevrolet Corvette. Roberts has sold approximately 80 Miami Spyders, shipping them in interstate commerce. In addition to the various components of the Miami Spyder's exterior, Roberts also offers for sale an interior package that essentially replicates the interior features of the Daytona Spyder. Depending on the components desired by the purchaser, the Miami Spyder costs between $8,500.00 and $50,000.00.

A more recent venture for Roberts is the marketing of an automobile known as the Miami Coupe. This car's existence also traces its roots to "Miami Vice." In 1986, Roberts supplied to the show's producers

an automobile designed to perform the stunts for the Testarossa loaned to the program by Ferrari. Soon thereafter, Roberts decided to build and sell a vehicle whose appearance would imitate that of the Ferrari Testarossa. Roberts' design of the Miami Coupe requires the attachment of several molded fiberglass panels to the frame of a Pontiac Fiero. The Fiero is used as the "donor car" because its space frame allows easy installment of Roberts' body panels. Although Roberts has not yet completed a Miami Coupe, two units are currently in production. One of these vehicles has enough of its body panels attached to make it apparent that once completed, the exterior of the automobile would be virtually identical to the body of the Ferrari Testarossa. To be sure, the features and dimensions of the Miami Coupe's exterior (doors, bumpers, hood, front grill, exhaust pipes, *etc.*), differ from those of the Ferrari Testarossa only where it is dictated by the substructure of the donor car.

The two Miami Coupes in production are being built for individuals who have made respective deposits of $15,000.00 and $24,275.00. One buyer resides in Massachusetts and the other resides in Ohio. Roberts' advertisements for the Miami Spyder also invite inquiries about the Miami Coupe. In exchange for $15.00, an advertisement respondent receives an informational pamphlet for the Miami Coupe. On the cover of the pamphlet is a drawing of an automobile whose exterior appearance is essentially identical to that of the Ferrari Testarossa. Roberts has distributed several of these pamphlets in the mail.

## II.

Roberts argues that the relief Ferrari seeks in this case is precluded by *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). At issue in *Bonito Boats* was a state statute, Fla.Stat. § 559.94 (1987), which made it " '... unlawful for any person to use the direct molding process to duplicate for the purpose of sale any manufactured vessel hull ... made by another without the written permission of that oth-er person.' " *Id.* at ——, 109 S.Ct. at 974, 103 L.Ed.2d at 130. Enacted to induce boat manufacturers to improve the designs of their boat hulls, the Florida statute "endow[ed] the original boat hull manufacturer with rights against the world, similar in scope and operation to the rights accorded a federal patentee." *Id.* at ——, 109 S.Ct. at 981, 103 L.Ed.2d at 139. More importantly, the Florida statute transcended federal patent law by conferring protection "... for an unlimited number of years to all boat hulls and their component parts, without regard to their ornamental or technological merit." *Id.* at ——, 109 S.Ct. at 982, 103 L.Ed.2d at 139–140. Indeed, "... even the most mundane and obvious changes in the design of a boat hull would trigger the protections of the statute." *Id.* at ——, 109 S.Ct. at 983, 103 L.Ed.2d at 141.

On review, the Supreme Court found that the Florida statute permitted the assertion of a substantial property right in an idea without regard for the "... careful protections of high standards of innovation and limited monopoly contained in the federal [patent law] scheme." *Id.* at ——, 109 S.Ct. at 982, 103 L.Ed.2d at 140. This conflicted with Supreme Court precedent precluding the states from offering patent-like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). In sum, the Court in *Bonito Boats* concluded that the Florida statute "... substantially restrict[ed] the public's ability to exploit an unpatented design in general circulation, raising the specter of state-created monopolies in a host of useful shapes and processes for which patent protection has been denied or is otherwise unobtainable." Because this constituted an impermissible intrusion into a regulatory field exclusively restricted to the Congress, the Supreme Court held that the Florida statute was preempted by the Supremacy Clause, and affirmed the judg-

ment of the Florida Supreme Court striking down the Statute.

■ This case does not involve a statute like the one at issue in *Bonito Boats*. Although earlier in this action Ferrari made a claim based on a similar statute, Tenn.Code Ann. § 47–50–111, that claim was abandoned after the publication of the decision in *Bonito Boats*. This case was tried solely on Ferrari's federal and common law claims of unfair competition. These kinds of actions encompass a wide spectrum of cases; claims similar to Ferrari's have been characterized previously as "misappropriation" *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (C.A.8 1976), *cert. den'd.* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); "unprivileged imitation" *Hartford House Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268 (C.A.10 1988), *cert. den'd* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); and "dilution" *Ameritech, Inc. v. American Inf. Technologies Corp.*, 811 F.2d 960, 965 (C.A.6 1987). In this case, Ferrari requests that the exterior shapes and features of two of its automobiles be clothed in the type of protection typically accorded to trademarks. Even without a registered trademark, a manufacturer's product "... may have an image or look referred to as 'trade dress' that is so distinctive as to become an unregistered trademark eligible for protection under the Lanham Act." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 517 (C.A.10 1987). Accordingly, the Lanham Act confers a right of action upon those claiming unfair competition for trade dress infringement. *Kwik–Site Corp. v. Clear View Mfg., Inc.*, 758 F.2d 167 (C.A.6 1985).

Regardless of how this action is characterized, both state and federal authority hold that the essential element of Ferrari's infringement claim is the likelihood of confusion between its product and Roberts'. *See, e.g., Men of Measure Clothing, Inc. v. Men of Measure, Inc.*, 710 S.W.2d 43, 48 (Tenn.App.1986) and *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 647 (C.A.6 1982). The necessity of showing this factual element further distinguishes this case from *Bonito Boats* because the statute at issue in that case operated to provide relief "... without any showing of consumer confusion." *Id.* — U.S. at ——, 109 S.Ct. at 986, 103 L.Ed.2d at 145. Plainly, *Bonito Boats* is inapposite to the facts of this case and its governing law. Notwithstanding this conclusion, Roberts argues that the case stands for the broad proposition that the law of unfair competition as it relates to trademarks serves to protect only the consumer. This argument is based on nothing more than dicta within *Bonito Boats* and consequently possesses little persuasive value. Moreover, it stands in flat contradiction to the weight of authority in the appellate circuits. Indeed, our own Court of Appeals has stated

> ... trademark law now pursues two related goals—the prevention of deception and consumer confusion, and more fundamentally, the protection of property interests in trademarks. *Ameritech, Inc., supra* at 964.

Consequently, this Court cannot agree with Roberts' narrow view of the law governing this case.

In addition to contesting the general principles involved in this case, Roberts more specifically contends that granting trademark protection to the exterior shapes and features of Ferrari's vehicles would violate the holdings of the precedent cases underlying *Bonito Boats; i.e., Sears* and *Compco*. This Court disagrees, relying on the reasoning employed by several other courts when addressing this same argument. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (C.A.2 1979), the court found that plaintiff had a trademark in the particular combination of colors and collocation of decorations possessed by the trade dress of its cheerleader uniform; *i.e.*, "[t]he familiar outfit ... of white vinyl boots, white shorts, a white belt decorated with blue stars, a blue bolero blouse, and a white vest decorated with three blue stars on each side of the front and a white fringe around the bottom." *Id.* at 202. In response to defendant's argument that finding a trademark in plaintiff's uniform violated *Sears* and *Compco*, the Court disagreed, stating:

In *Sears–Compco* the Court held merely that a state may not, through its law banning unfair competition, undermine the federal patent laws by prohibiting the copying of an article that is protected by neither a federal patent nor a federal copyright. For the Court to have held otherwise would have been to allow states to grant a monopoly to a producer where the federal government had specifically determined that free competition should prevail. This consideration does not apply in a trademark infringement action where the plaintiff does not assert exclusive rights to the sale of a product but merely to a mark indicating its origin or sponsorship. The question presented therefore is one of trademark law, and it is clear that *Sears–Compco* did not redefine the permissible scope of the law of trademarks insofar as it applies to origin and sponsorship. *Dallas Cowboys, supra,* at 204 (citations omitted).

This line of reasoning is echoed in other cases such as *Truck Equipment Serv. Co., supra,* at 1215, and *Brunswick Corp., supra,* at 526, n. 7. Consequently, the Court finds defendant's contrary position to be without merit in this case.

### III.

■ A plaintiff can recover under § 43(a) of the Lanham Act for trade dress infringement if the following three elements are proven by a preponderance of the evidence: first, that the trade dress has obtained secondary meaning; second, that the appropriated features of the trade dress are primarily non-functional; and third, that the trade dress of the two competing products is confusingly similar. *Kwik–Site Corp. supra* at 178.

### A. SECONDARY MEANING

■ Secondary meaning occurs when a feature is so associated in the public mind with a goods provider that the public distinguishes that provider from other providers of the same good by that feature. *Watch What Develops Franchise Concepts, Inc. v. Par Five, Inc.,* 825 F.2d 412 (C.A.6 1987), unpublished. The chief inquiry for secondary meaning is whether the mark denotes

to the consumer " 'a single thing coming from a single source.' " *Barrios v. American Thermal Instruments, Inc.,* 712 F.Supp. 611, 616 (S.D.Ohio 1988), citing *Sir Speedy Inc. v. Speedy Printing Centers, Inc.,* 746 F.2d 1479 (C.A.6 1984), unpublished, *cert. den'd* 469 U.S. 1217, 105 S.Ct. 1195, 84 L.Ed.2d 341 (1985). To establish secondary meaning for the exterior shapes and features of the Daytona Spyder and the Testarossa, Ferrari conducted a consumer survey for each vehicle. The report for the Daytona Spyder survey concluded that a high level of secondary meaning exists for that automobile. This conclusion resulted from testing the survey respondents' ability to view photographs of several different automobiles and identify their respective manufacturers. In these photographs, all badges of identification are removed and the automobiles appear in the same positions. Viewing these photographs, 73% of the survey respondents correctly identified the Daytona Spyder as manufactured by Ferrari. The survey for the Testarossa was conducted according to essentially the same methodology as that governing the survey for the Daytona Spyder. The resulting report also concluded that a high level of secondary meaning exists for the shape and features of the Testarossa. Specifically, 82% of the survey respondents correctly identified Ferrari as the manufacturer of the Testarossa.

The Court finds that the surveys conducted for the Daytona Spyder and Testarossa were conducted according to generally accepted survey principles. The Court also finds that the surveys provide material and probative evidence on the issue of secondary meaning. This evidence is corroborated by the cumulative testimony of witnesses such as Lawrence C. Crane, Art Director of "Automobile Magazine." According to Mr. Crane's credible testimony, the shape for both the Daytona Spyder and the Testarossa are very distinctive, distinguishing these vehicles from other high performance automobiles. Ferrari's evidence at trial on the issue of secondary meaning was uncontroverted by Roberts. In view of the substantial weight and credi-

bility of Ferrari's proof, the Court finds that Ferrari established by a preponderance of the evidence the element of secondary meaning; *i.e.*, the exterior shapes and features of the Daytona Spyder and the Testarossa are so associated in the public mind with Ferrari that the public distinguishes Ferrari from other automobile manufacturers by those shapes and features.

## B. FUNCTIONALITY

■ The functionality of an article concerns the extent to which the item's shape, size, or form affects its utility or the economy of its production. *See West Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 594 (C.A.6 1955). A design is non-functional if it is "... 'a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality' ..." *See Tas–T Nut Co. v. Variety Nut & Date Co.*, 245 F.2d 3, 6 (C.A.6 1957), quoting *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (C.A.9 1952). The appropriate inquiry for the functionality of trade dress "... is not whether each individual feature of the trade dress is functional but whether the whole collection of features, taken together is functional." *Hartford House, Ltd., supra*, at 1272. Furthermore, the article at issue is required to be only *"primarily* non-functional" *Kwik–Site, supra*, at 178 (emphasis added). Consequently, an item's features can be non-functional even when they serve a useful purpose if they primarily serve to indicate sponsorship or origin.

To support its claim of non-functionality, Ferrari produced the testimony of Angelo Bellei, the individual responsible for the development of Ferrari's grand touring cars between 1964 and 1975. Mr. Bellei's testimony was uncontroverted that he was intimately involved with the decision-making for the designs of both the Daytona Spyder and the Testarossa. Mr. Bellei explained that the bodies for each were commissioned to the design firm of Paninfarina. As part of the design process, Paninfarina submitted several different design proposals for each the Daytona Spyder and the Testarossa. In each case, Mr. Bellei

asserted that the ultimate body design chosen was selected for its beauty and distinctiveness. Asserting that any one of the design proposals would have been compatible with the mechanics of the automobiles, Mr. Bellei credibly testified that the bodies for the Daytona Spyder and the Testarossa were not chosen for functional reasons.

Ferrari produced cumulative testimony supporting the assertions of Mr. Bellei and the inference that utility and economy of production are largely irrelevant factors in the exterior shapes and features of the Daytona Spyder and Testarossa. Furthermore, Roberts adduced no evidence to counter Ferrari's proof that its exteriors were adopted primarily for purposes of distinctiveness. Therefore, the Court finds that Ferrari proved by a preponderance of the evidence that the exterior shapes and features of the Daytona Spyder and Testarossa are non-functional.

## C. CONFUSION

■ Roberts argues that Ferrari is not entitled to relief in this case unless it shows that a potential purchaser of Roberts' vehicles would actually believe that Roberts' automobile is in fact Ferrari's vehicle. This argument is erroneous for two reasons. First, it suggests that the Lanham Act provides a remedy only in the case of "passing off"; *i.e.*, an instance where the defendant uses the plaintiff's " 'well-known product, name, symbol, or familiar packaging to attract the public to the product under the assumption that it is the plaintiff's product which is bought.' " *Frisch's, supra* at 647. However, passing off is only one of several kinds of infringement actions cognizable under the Lanham Act. *Ameritech, Inc., supra*, at 964. Second, defendant's argument assumes that the standard for confusion is *actual* confusion. This is incorrect, as the Sixth Circuit has stated on several occasions that the determination of confusion rests on several factual considerations. *E.g. Frisch's, supra; Kwik–Site, supra*. Although actual confusion is one of the applicable factors, it is not a primary consideration and absence

of its proof is not significant. *Wynn Oil v. Thomas*, 839 F.2d 1183, 1188 (C.A.6 1988).

■ Contrary to Roberts' restricted viewpoint, "[t]he general concept underlying the likelihood of confusion is that the public believe that 'the mark's owner *sponsored or otherwise approved* the use of the trademark'" *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (C.A.6 1983) (emphasis *sic*). In determining whether the alleged infringement of a trademark causes a likelihood of confusion among consumers, the following eight factors are to be considered: the strength of plaintiff's mark; relatedness of the goods; similarity of the marks; evidence of actual confusion; marketing channels used; likely degree of purchaser care; defendant's intent in selecting the mark; and likelihood of expansion of the product lines. *Wynn Oil, supra,* at 1186. These eight factors bear no hierarchial value to one another and a plaintiff may prevail without showing all or even most of the factors. *Id.*

In this case, no evidence was offered to show either actual confusion or the likelihood of expansion of the product lines. For two other factors, the evidence in this case corresponding to those factors favors Roberts. Even assuming a purchaser who is totally unaware of Ferrari, there is no reason to doubt that the minimum sales price of Roberts' kit for the Miami Spyder ($8,500.00) would cause this hypothetical customer to exercise a high degree of purchaser care. Likewise, the evidence shows that Ferrari's and Roberts' vehicles are sold through very different marketing channels. For the remaining confusion factors, however, the evidence radically favors Ferrari.

■ Based on this Court's discussion of secondary meaning, it is clear that Ferrari's marks—*i.e.,* the exterior shapes and features of the Daytona Spyder and Testarossa—are strong. Furthermore, Ferrari's and Roberts' products must be deemed closely related because they are essentially the same things, automobiles. In assessing the similarity of marks, courts are not required to compare them side-by-side; instead, a court "... must determine in light of what occurs in the marketplace whether the mark 'will be confusing to the public when singly presented.'" *Id.* (citation to quote omitted). As this Court has previously found, the exterior of Roberts' Miami Coupe closely imitates that of Ferrari's Testarossa, differing only where required by the frame of the donor car. Furthermore, comparison of photographs of one of Roberts' Miami Spyders currently under production (plaintiff's exhibit 161) with photographs of the Daytona Spyder shows that the body of the Miami Spyder virtually mirrors the exterior of Ferrari's Daytona Spyder. Consequently, the Court finds that the exterior shapes and features of the Miami Coupe and Miami Spyder are, respectively, very similar to those of the Testarossa and Daytona Spyder, and that this similarity will be confusing to the public when either the Miami Coupe or the Miami Spyder is singly presented.

When a mark is chosen with the intent of deriving benefit from the reputation of the senior user, then that fact alone may show confusing similarity. *Id.* at 1188–1189. A principal assertion of Ferrari's case is that Roberts produced the Miami Coupe and the Miami Spyder with the intent of deriving benefit from the reputation of Ferrari's Testarossa and Daytona Spyder. At trial, the strongest proof of this intent was provided by Vivian Bumgardner, a legal investigator who met Carl Roberts on two occasions. At both meetings, Ms. Bumgardner represented that she was interested in purchasing a Miami Coupe. Ms. Bumgardner testified Mr. Roberts affirmed during a meeting in December 1987 that when looking at the Ferrari Testarossa and Roberts' Miami Coupe, one cannot tell the difference between the two. According to Ms. Bumgardner, Mr. Roberts asserted that his company "... build[s] and sell the same car, reproduce it ... [*sic* ]", and explained that while the Testarossa cost $140,000.00, the Miami Coupe cost less than $50,000.00, making the Miami Coupe "... more of a practical car ..." than the Testarossa. Ms. Bumgardner's testimony is credible and the Court accords it significant weight.

■ The whole of the evidence in this case preponderates in favor of finding that Roberts chose for his automobiles the exterior shapes and features of the Daytona Spyder and Testarossa with the intent of deriving benefit from the reputation of Ferrari. Coupled with the Court's findings for the other confusion factors, this conclusion causes the Court to find that Ferrari showed by a preponderance of the evidence a likelihood of confusion between the Miami Coupe and the Ferrari Testarossa and between the Miami Spyder and the Daytona Spyder. Based on this conclusion and the Court's findings for the other two elements of Ferrari's federal claim, the Court concludes that Ferrari has proved that Roberts' Miami Coupe and Miami Spyder infringe Ferrari's trademarks in the exterior shapes and features of the Testarossa and Daytona Spyder, violating § 43(a) of the Lanham Act.

## IV.

■ Ferrari contends that its claim of unfair competition under Tennessee common law can be proven with the same proof necessary to recover under the Lanham Act. To support this contention, Ferrari cites only one case: *Hall v. Britton*, 41 Tenn.App. 72, 292 S.W.2d 524 (1954). This case does not provide strong support for Ferrari's assertion because the appellate decision chiefly concerns the appropriation of trade secrets. *See Hickory Specialties v. B & L Laboratories*, 592 S.W.2d 583, 585 (Tenn.App.1979). The language in *Hall* supportive of Ferrari's position is as follows:

> [t]o constitute unfair competition the product of defendants need not be an exact copy of complainant's, but need only be so reasonably similar in appearance, use and name as to cause an unwary purchaser to confuse the products.

*Id.* 292 S.W.2d at 531.

A close reading of this passage indicates that similarity between the two products must "cause" confusion in order to merit relief for unfair competition. This factual requirement differs significantly from that of a claim brought under the Lanham Act which requires a plaintiff to show only a "likelihood" of confusion. *E.g. Kwik–Site, supra*, at 178.

■ A review of other cases confirms that Ferrari is required to show more than a violation of the Lanham Act in order to recover for Tennessee's common law tort of unfair competition. In *Plastic Industries, Inc. v. Yarborough and Co.*, unreported, Court of Appeals, Western Section, (November 21, 1988), 1988 WL 123948, the court asserts that "palming off" is the essence of a claim for unfair competition under Tennessee common law, requiring a plaintiff to show

> an intent to deceive the public as to the source of the goods or services offered, as well as actual deception.

*Id.*, citing *United Van Lines v. American Holiday Van Lines, Inc.*, 487 F.Supp. 235, 239 (E.D.Tenn.1979). This description of Tennessee's common law tort of unfair competition is repeated in *National Medical Care, Inc. v. Gardiner*, unreported, Court of Appeals, Middle Section (March 12, 1986) 1986 WL 3157. Therefore, the Court finds that recovery for Ferrari's state law claim requires proof of an intent to deceive and actual deception. However, no evidence was adduced showing that Roberts attempted to deceive his customers into believing that the source of his automobiles was Ferrari. Indeed, the only evidence on this issue tended to show that Roberts made efforts to apprise his customers that regardless of appearances his vehicles were not genuine Ferraris. Therefore, the Court concludes Ferrari cannot recover in this action for Tennessee's common law tort of unfair competition.[2]

---

**2.** Outside of the common law tort of unfair competition, Ferrari's case is problematic when limited to Tennessee law. To reiterate, Ferrari essentially seeks trademark protection for the trade dress of its two vehicles. To this Court's knowledge, no state court in Tennessee has addressed the threshold issue of whether trade-

mark protection is accorded to trade dress. Even assuming that Tennessee law allows for the protection requested, Ferrari's claim would still fail. Protective rights for unregistered trademarks arise from prior appropriation and use in trade. *See Men of Measure Clothing, supra*, at 45. However, Ferrari produced no

## V.

Ferrari was able to prosecute this action only due to a Stipulation and Order filed in Roberts' bankruptcy proceeding that lifted the automatic stay as to this case. (Doc. 36). Although some of the language in the Order lifting the stay arguably permits Ferrari to seek any relief deemed "equitable," the Court finds that the overall intent of the Order was to limit potential remedies to injunctive relief. Therefore, the Court declines to address the issues of whether Ferrari is entitled to either an equitable accounting or attorney fees in this case. Based on the foregoing, the Court finds in favor of Ferrari and against Roberts on the claim of unfair competition brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Court finds in favor of Roberts and against Ferrari on the claim of unfair competition brought under Tennessee common law. Consequently, the Court will file an Order entering judgment in accord with this Memorandum Opinion and granting Ferrari a permanent injunction restraining Roberts from infringing Ferrari's trademark rights in the trade dress of the Daytona Spyder and the Testarossa.

## ORDER

Based on the foregoing Memorandum Opinion passed this day to the Clerk for filing, the Court finds in favor of defendant and against plaintiff on plaintiff's claim brought under Tennessee common law for unfair competition. Accordingly, judgment is ENTERED in favor of defendant and plaintiff takes nothing on this claim.

Pursuant to the Memorandum Opinion previously referenced, the Court finds in favor of plaintiff and against defendant on plaintiff's claim brought under 15 U.S.C. § 1125(a). Accordingly, judgment is ENTERED in favor of plaintiff and the Court ORDERS the following PERMANENT INJUNCTION:

1. Carl Roberts, d/b/a Roberts Motor Company (Roberts), his agents, officers, servants, employees, representatives, affiliates, related companies, distributors, dealers, heirs, successors and assigns, and all persons acting for, with, by, through, or under him or them, and each of them, are PERMANENTLY ENJOINED from directly or indirectly:

(a) manufacturing, or selling, or distributing, or in any manner, enabling or aiding others to manufacture, or to sell, or to distribute the Miami Spyder and the Miami Coupe and all versions thereof, including but not limited to their exterior shapes and features, the designs of which have been determined to violate plaintiff's (Ferrari) right to protection under the Lanham Act with respect to 365 GTB/4 (Daytona Spyder) and the Testarossa;

(b) using in any manner on or in connection with the advertising, or manufacturing, or distributing, or offer for sale, or selling of any automobile, the designs of the Miami Spyder and the Miami Coupe and all versions thereof;

(c) using any Ferrari badges, emblems, names or indicia of any kind, including but not limited to the word "Testarossa" and the Ferrari prancing horse, and further including any imitations thereof, in connection with the advertising, manufacture, offering for sale, sale or distribution of any products or parts thereof not made by Ferrari.

(d) from shipping, delivering, distributing, selling or otherwise disposing of, in any manner, the Miami Spyder, the Miami Coupe, or molds or parts thereof.

---

evidence at trial of prior appropriation and use of the claimed trademarks in Tennessee commerce.